## Richmond

EDWARD BENTON FITZGERALD

V.

COMMONWEALTH OF VIRGINIA

June 18, 1982.

Record No. 811669.

Present: All the Justices.

618

*Frank N. Cowan (W. Joseph Owen, III; Deborah S. O'Toole; Cowan, Owen & Nance,* on brief), for appellant.
*Robert H. Anderson, III, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

A jury found Edward Benton Fitzgerald guilty of the capital murder of Patricia Cubbage;[1] armed robbery; rape; abduction with intent to defile; and burglary. For each of the offenses other than capital murder, the jury fixed Fitzgerald's punishment at confinement in the penitentiary for life. In the second part of the bifurcated proceeding required by Code §§ 19.2-264.3 and -264.4 in the capital murder case, the same jury fixed Fitzgerald's sentence at death. After considering the probation officer's report filed pursuant to Code § 19.2-264.5, the trial court imposed the

---

[1] The two-count indictment for capital murder charged Fitzgerald with the willful, deliberate and premeditated killing of Patricia Cubbage in the commission of robbery while armed with a deadly weapon (Code § 18.2-31(d)) and during the commission of, or subsequent to, rape (Code § 18.2-31(e)). The jury found him guilty under both counts.

death sentence by order entered September 4, 1981, and on the same date, entered judgment on the other jury verdicts.

Fitzgerald seeks a reversal of all his convictions and remand for a new trial. Having consolidated the automatic review of his death sentence with his appeal from his convictions, we have given them priority on our docket.

Daniel L. Johnson, the codefendant charged with the same offenses as Fitzgerald, related the relevant facts as the principal witness for the Commonwealth. On the afternoon of November 13, 1980, he and Fitzgerald were drinking beer at Fitzgerald's apartment when Don Henn, Patricia Cubbage, and Angelia Robinson arrived. According to Johnson, they drank beer and smoked marijuana which Cubbage had supplied.

That evening, fifteen or twenty minutes after Henn, Cubbage, and Robinson left the apartment, Fitzgerald received a telephone call from a friend who was subsequently identified as David Bradley. At Fitzgerald's request, Johnson agreed to drive him to the friend's apartment in Sandston; anticipating trouble, Fitzgerald produced a machete which Johnson strapped on himself. As they proceeded to Sandston in Johnson's car, the men consumed several pills from a baggie in Fitzgerald's possession, but Johnson could not remember what kind of pills Fitzgerald told him they were taking. They found no trouble when they arrived at Bradley's apartment. Fitzgerald and Bradley discussed a legal paper that Bradley had received; Johnson and Bradley each drank a beer.

When Fitzgerald and Johnson left Bradley and his wife about midnight, Bradley gave Fitzgerald a cellophane bag. Before driving off, Johnson returned the machete to Fitzgerald. During the drive, Fitzgerald said that there was "acid" (lysergic acid diethylamide, or LSD) in the cellophane bag; Johnson declined to take any, but Fitzgerald "took a hit of it." Subsequently, Johnson heard Fitzgerald "mumbling" that Cubbage "had ripped him off."

At Fitzgerald's suggestion, the pair decided to steal some drugs from Henn's residence. Parking nearby, they found the house locked. Fitzgerald failed to pry open a door with Johnson's lug wrench, but the men gained entrance by kicking in the door. Johnson knew of one area on the premises where drugs were kept, and he knew that Cubbage was a drug dealer. While searching the living room, he heard Fitzgerald run up the stairs leading from the lighted hallway. A woman's voice, which Johnson recognized as Cubbage's, asked Fitzgerald why he was there. When

Cubbage screamed, Johnson ran upstairs and saw Cubbage nude, on her knees on the floor, apparently stunned, with a cut over her left eye. Johnson helped her into bed and attempted to leave, but Fitzgerald pushed him against the wall, pressed the machete to his throat, and ordered him to remain.

Although Cubbage protested that she was menstruating, and Johnson saw evidence of this, Fitzgerald had sexual intercourse with her. He then struck her several times with the machete, almost cutting off her thumb when she attempted to ward off his blows. At Fitzgerald's command, Johnson helped Cubbage to dress. Cubbage twice asked Fitzgerald to take her to a hospital, but he refused, explaining after her second request that he had come there "to do a job and he was going to finish it." As the men led Cubbage from the bedroom, Fitzgerald seized her purse. They went through the kitchen, where Fitzgerald stopped long enough to break the glass in a microwave oven and take some luncheon meat from the refrigerator, and left in Johnson's car, with Johnson driving and the other two riding in the back seat.

Following Fitzgerald's directions, Johnson drove down a remote dirt road, parked near some woods, and extinguished the car lights. Fitzgerald threw Cubbage's clothes behind the car. Johnson led Cubbage a short distance into the woods, where Fitzgerald pushed her to her hands and knees and forced her to engage in oral sodomy with him until she said she could not continue because of blood in her mouth. Fitzgerald struck her with the machete, and Cubbage said, "God, please just blow my brains out and get it over with . . . ." Fitzgerald proceeded to mutilate her by stabbing and slashing her repeatedly, from head to feet, front, sides, and back, including both eyes, as well as genital and rectal areas, with the machete and with a knife that he removed from his wallet.[2] Fitzgerald then "kicked her a few times," before he and Johnson covered her dead body with leaves.

Asked why he had done the things to which he had testified, Johnson replied that he was afraid that Fitzgerald, who was "tripping" from the LSD, would kill him if he did not cooperate. Johnson maintained that he was "too scared to run," that he did not remember "being so frightened" in his life.

---

[2] The medical examiner testified that he counted a minimum of 184 stab and cut wounds, that death was caused by loss of blood, and that all the wounds were inflicted before death. In his opinion, the wounds were consistent with Fitzgerald's knife, and more than one weapon could have been used.

As they went back to the car, Johnson said, Fitzgerald asked him if he wanted to forget what had happened, and when he replied in the affirmative, gave him some "acid," which he consumed. They drove to a dumping area, where Fitzgerald, looking in Cubbage's purse, found several medicine bottles, one pill, two syringes, and a "dime" of marijuana. Fitzgerald kept the pill, divided the marijuana with Johnson, and threw the purse with its remaining contents on the ground. They returned to Fitzgerald's apartment, where Fitzgerald handed the machete and knife to his wife. There was blood on Johnson's face, arm, and tennis shoes, and on Fitzgerald's hands and arms. Fitzgerald put his own clothes in the washing machine. Johnson went to the bathroom and vomited before washing off the blood; he left his tennis shoes and clothes for Fitzgerald to wash.

Informing Johnson that he was "now a one percenter," Fitzgerald tattooed on Johnson's arm the "one percenter mark" which, he told Johnson, meant that the person who wore it "was a total outlaw and had no respect for the law whatsoever and didn't care for anyone but himself." Johnson knew of "one biker group" that used this tattoo and he knew that Fitzgerald wore one. He exhibited his mark to the jury.

Angelia Robinson testified that about 8:30 p.m. on November 13, she, Cubbage, and Henn went to Fitzgerald's apartment. She described Fitzgerald as "drunk" at that time; he was drinking beer. About 10:00 p.m. Robinson, Cubbage, and Henn left the apartment and went to a restaurant for "a couple of drinks." Cubbage was tired, so Robinson and Henn took her back to Henn's house, where Henn, his wife, who was away on a business trip, Robinson, and Cubbage resided, and Cubbage went to bed. Robinson telephoned to her "agency," found that she had a "call," and left with Henn for Richmond about 12:30 a.m.; when they returned about 3:00 a.m. and discovered that Cubbage was missing and that there were bloodstains throughout the house, they called the police.

Henn testified that on the evening of November 13, he was given capsules of Tranxene, "a mild tranquilizer," by Fitzgerald's wife, Bonnie. At Fitzgerald's request, Henn gave him five or six of these capsules.

In driving to the Henn residence in response to the report of Cubbage's disappearance, Officer James W. Stanley, of the Chesterfield County Police Department, recognized Johnson's car as it

emerged from a side street near a dumping area. He had often seen the car parked at night near Johnson's apartment, but he had never before seen it in operation at such an hour. He found, upon inquiring into Cubbage's activities on the evening of November 13, that she had been in a group that included Johnson. Returning to the area where he had observed Johnson's car, the officer searched until he found Cubbage's purse with its contents scattered nearby. On the same afternoon, November 14, Cubbage's body was discovered; shortly thereafter, Johnson and Fitzgerald were arrested and charged with capital murder.

The Commonwealth introduced into evidence color photographs of Cubbage's bedroom, Johnson's automobile, and the place where Cubbage's body was found. Commonwealth exhibits included Cubbage's purse and its contents, her clothing and glasses, Fitzgerald's knife, which had been found hidden in his apartment, Fitzgerald's tatto kit, pubic hair samples consistent with Fitzgerald's found in Cubbage's bed, and bloody floor mats and a bloody newspaper from Johnson's car. The trial court, excluding color photographs of Cubbage's body, admitted black-and-white photographs of the body.

Wilbur H. Caviness, who had been an inmate in the Chesterfield County Jail while Fitzgerald was confined there pending trial, testified that he asked Fitzgerald why he would do such a thing as "kill this woman and cut her up." According to Caviness, Fitzgerald stated that he had had intercourse with her and cut up her genital area because she "snitched on him and snitched on a friend of his also." There was evidence that Cubbage was a police informer and that an informer is sometimes referred to as a "snitch."

Forensic evidence established that the blood found on the floor mats and newspaper in Johnson's car, on his tennis shoes, and on Cubbage's blue jeans was the same type as that of Cubbage in each of the six systems analyzed. Blood on Fitzgerald's shoes could be analyzed in only three systems, but it was the same type as Cubbage's and different from that of Johnson and Fitzgerald.

The Commonwealth presented Dr. Robert V. Blanke, Director of the toxicology laboratory and professor of pharmacology at the Medical College of Virginia as an expert witness to testify to the effect of certain drugs. He answered a hypothetical question based on the facts adduced by the Commonwealth's evidence against Fitzgerald by stating that none of the described actions was char-

acteristic of the effects of LSD, and that the hypothetical individual could not have carried out those actions as a result of the influence of LSD, Tranxene, or alcohol. In his opinion, none of the three drugs, regardless of dosage, could have produced the described behavior.

David Bradley and Lenore Bradley, his wife, testified as witnesses for Fitzgerald. They said that Johnson was sober; that he drank only half a beer at their apartment while Fitzgerald had two or three beers; that the two men came at 10:30 p.m. and left at 1:20 a.m.; and that Bradley gave them vacuum cleaner bags for Fitzgerald's wife but no drugs. Bradley described Fitzgerald as "a little bit drunk." His wife said that Fitzgerald seemed to be his "regular self when he was drinking," which meant to her that he looked as if he might "pass out."

Dr. William M. Lordi, a psychiatrist, testifying as an expert witness for the defense, described Fitzgerald as a chronic alcoholic with a paranoid personality, who had used LSD and other drugs since the age of twelve. He characterized Tranxene as a mood depressant; if the dosage is insufficient to make a person comatose, mental functions become "dulled or knocked out" and yet he may still be ambulatory. LSD is "very dangerous" and is used, Dr. Lordi said, to "escape the world." Use of LSD with a large quantity of beer would increase the effect of the LSD, so that the person's ability to plan would be poor, and the result might be "explosive laughter" or it might be unpredictable violence. When asked on cross-examination whether the man described in the hypothetical question submitted to Dr. Blanke was incapable of forming an intent, and was incapable of premeditating and planning the actions described, he replied in the negative.

In the sentencing phase of the trial, the Commonwealth introduced into evidence, over objection, color photographs of Cubbage's body. The Commonwealth also presented a record of Fitzgerald's conviction in Richmond in 1979 for unlawful wounding. The officer who investigated that offense testified that Fitzgerald was charged with aggravated assault against his wife, Bonnie Fitzgerald, and use of a firearm in the commission of that felony. Fitzgerald told the officer that he had shot his wife when he came upon her and a friend of his engaging in sexual intercourse on the living room floor in the Fitzgerald apartment. Under a plea bargaining agreement, Fitzgerald pleaded guilty to the lesser offense of unlawful wounding. There was evidence that the Fitzgeralds

were still living together at the time of the Cubbage slaying, that Bonnie Fitzgerald was confined to a wheelchair, and that she had a supply of prescription Tranxene.

Fitzgerald did not testify in the sentencing proceeding. The record shows that in declining to testify at this stage, he rejected the recommendation of his attorneys.

Of the 27 alleged errors assigned by Fitzgerald, several, including one based upon the admission into evidence of the color photographs of Cubbage's body, were not pursued on brief or in oral argument. We will treat such errors as waived and will not consider them in this opinion.

## I. Pretrial Proceedings.

### A. Motion to Suppress Evidence.

Fitzgerald filed a motion to suppress all evidence obtained from him without his consent. At the pretrial hearing on his motion, however, he sought to exclude only a pair of his shoes.

Fitzgerald testified that Lieutenant H. M. Shelton interviewed him on November 14, and asked for his shoes. Fitzgerald said that he did not give the shoes to Shelton voluntarily but only under threat of arrest.

Shelton testified that on the morning of November 14 he and other officers had seized as evidence bloodstained items from Johnson's car. They learned from Johnson that he had been out all night with Fitzgerald and had left his clothes at Fitzgerald's apartment. Shelton and another officer proceeded without an arrest or a search warrant to the Fitzgerald apartment, found Bonnie Fitzgerald there, advised her of her constitutional rights, took a statement from her, and recovered Johnson's tennis shoes.

Shelton said that while he was at the apartment Fitzgerald returned on a motorcycle; the officer interrogated him at 1:33 p.m. after Fitzgerald had signed a waiver of his *Miranda* rights. The interview was conducted prior to discovery of Cubbage's body. Fitzgerald admitted having been with Johnson all night. During the interview, noticing what appeared to be bloodstains on Fitzgerald's shoes, Shelton asked Fitzgerald to give him the shoes as evidence. According to Shelton, Fitzgerald at first asked him to take another pair, but then removed and delivered to the officer the shoes that were requested. Shelton said that he did not

threaten to arrest Fitzgerald but conceded that he would not have left without the shoes, even if it had been necessary to arrest him.

We reject Fitzgerald's argument that the suppression hearing was fatally flawed because the trial court, with the acquiescence of Fitzgerald's counsel, imposed the burden on Fitzgerald of proving that the warrantless seizure of his shoes was unreasonable. We construe the court's position to be no more than the usual requirement that Fitzgerald, as the moving party, go forward with evidence in support of his motion. The burden is on the Commonwealth to show, for example, that consent to a warrantless search is freely and voluntarily given. *Hairston* v. *Commonwealth*, 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975), *cert. denied*, 425 U.S. 937 (1976). Although the trial court did not specify the basis for overruling the motion to suppress, there was evidence from which the court could conclude that the shoes were voluntarily delivered to Shelton. Such a conclusion must be accepted by us on appeal unless clearly erroneous. *Stamper* v. *Commonwealth*, 220 Va. 260, 268, 257 S.E.2d 808, 814 (1979), *cert. denied*, 445 U.S. 972 (1980).

■ If, as the Commonwealth suggests, the trial court relied on the "plain view" exception to the warrant requirement, the same result was properly reached. Where a police officer, with justification for being on the premises, is not searching for evidence against the accused but inadvertently comes across incriminating evidence, he may seize it without a warrant. *Lugar* v. *Commonwealth*, 214 Va. 609, 612, 202 S.E.2d 894, 897 (1974); *cf. Holloman* v. *Commonwealth*, 221 Va. 947, 275 S.E.2d 620 (1981). Fitzgerald concedes that Shelton was lawfully on the premises. The trial court reasonably could infer from the evidence that Shelton was in the Fitzgerald apartment to search for and seize the clothes which Johnson had admitted leaving there. Likewise, the court reasonably could conclude that when Shelton was interviewing Fitzgerald, he was not searching for physical evidence against him and merely through inadvertence observed what appeared to be incriminating bloodstains on Fitzgerald's shoes.

■ Absent a statutory mandate, such as that applicable in habeas corpus proceedings, Code § 8.01-654(B)(5), a trial court is not required to give findings of fact and conclusions of law. Regardless of the basis for its decision, therefore, we hold that the trial court did not err in overruling Fitzgerald's motion to suppress

the shoes which were subsequently introduced into evidence against him.

## B. Qualifications of Jurors.

■ Fitzgerald says that the trial court should have stricken for cause three veniremen, Horace Elwin Hackney and Hampden S. Mann, Jr. for being "death prone," and Arthur Griffin for not being disinterested and unbiased. We disagree.

On *voir dire,* Hackney and Mann responded affirmatively when asked whether a person should be given the death penalty if he has the intent to kill a victim and kills during the commission of a robbery or rape. In each instance, the prospective juror had given satisfactory answers to the questions propounded by the trial court pursuant to Rule 3A:20(a), and to questions propounded by opposing counsel, and had told the court that he did not feel that every person convicted of murder should receive the death penalty. After the answers now in issue had been given, the court explained the factors to be considered in the sentencing phase of the trial before the death penalty could be imposed and asked Hackney and Mann, in separate inquiries, whether they would follow the court's instructions. Each answered without equivocation that he would.

The trial court stated that the question as propounded was misleading because it did not include everything that should be taken into consideration in imposing the death sentence, and requested that defense counsel thereafter "modify the question" to avoid misunderstanding. Defense counsel acceded to this request without objection.

To determine whether these prospective jurors should have been excluded for cause, we have reviewed their entire *voir dire* rather than the single question and answer. *See L. E. Briley* v. *Commonwealth,* 222 Va. 180, 182, 279 S.E.2d 151, 152-53 (1981). From our review, we conclude that Hackney and Mann showed an earnest desire and willingness to decide the case, both as to guilt and as to punishment, on the basis of the evidence presented, that they understood that the Commonwealth had the burden of proof, and that Fitzgerald was presumed to be innocent and was not required to testify or to present any evidence. Each assured the court that he would not vote for the death penalty, if Fitzgerald were convicted of capital murder, except in accordance with the court's instructions.

On *voir dire,* after giving satisfactory answers to the court's questions and to numerous questions propounded by opposing counsel, Griffin answered affirmatively when asked by defense counsel if he believed that because Fitzgerald had been arrested and indicted he must be "involved" in the charges for which he was being tried. Subsequently, he amplified his answer by saying that when he used the word "involved" he thought that Fitzgerald "would have to know someone or some kind of way be involved." Upon further questioning by defense counsel, Griffin gave assurances that in the event of a capital-murder conviction he would consider the evidence in determining an appropriate sentence and would not automatically vote for the death penalty. He also responded affirmatively to the court's question whether he understood that an indictment is not evidence of guilt. After reviewing the *voir dire* in its totality, we hold that there is no merit in Fitzgerald's objection and that the court did not abuse its discretion in seating Griffin.

## II. The Guilt Trial.

### A. Admissibility of Evidence.

#### 1. Testimony of Dr. Robert V. Blanke.

Fitzgerald contends that the trial court erred in permitting Dr. Blanke to answer the hypothetical question propounded to him as an expert witness for the Commonwealth. In answering the question, Fitzgerald says, Dr. Blanke invaded the province of the jury by deciding the ultimate issue in the case.

An expert witness may express an opinion upon matters not within the common knowledge or experience of the jury. *Cartera* v. *Commonwealth,* 219 Va. 516, 519, 248 S.E.2d 784, 786 (1978). Dr. Blanke testified, without objection, to the individual and cumulative effects of LSD, Tranxene, and alcohol. In answering the hypothetical question, the expert expressed his opinion that the ingestion of various quantities of LSD, Tranxene, and beer could not cause a person to commit certain specified acts of violence or render a person incapable of having the intent to commit such acts. This was a subject in which jurors could not be expected to be knowledgeable.

The credibility of witnesses was left to the jury, as was the determination of guilt or innocence. The jury was entitled to have the benefit of expert opinion as to the cumulative effect of LSD,

Tranxene, and alcohol, in answer to a hypothetical question based upon evidence in the record. The hypothetical question that we held to be inadmissible in *Coppola v. Commonwealth,* 220 Va. 243, 252-53, 257 S.E.2d 797, 803-04 (1979), *cert. denied,* 444 U.S. 1103 (1980), was not only cumulative but was intended to show that a named witness could not be believed. Although we acknowledged that a properly drafted hypothetical question could have addressed the subject of a personality disorder in the witness, we upheld the trial court's exclusion of the question as framed. In the present case, the expert did not attempt to express an opinion as to the veracity of any witness, and we hold that the trial court did not err in admitting his testimony.

2. The Report of the Medical Examiner and the Autopsy Report.

Fitzgerald argues that since Dr. William Massello, III, Deputy Medical Examiner, testified as a witness for the Commonwealth, the trial court erred in admitting the report of his investigation and the Autopsy Report which he prepared. Fitzgerald says that these reports unfairly emphasized the gruesome details of the murder and contained inadmissible hearsay. We hold that there is no merit in Fitzgerald's argument.

Code § 19.2-188 provides a statutory exception to the hearsay rule by permitting investigation reports and autopsy reports of the Chief Medical Examiner or his assistants to be received in evidence without requiring the investigating official to testify. *See Bass v. Commonwealth,* 212 Va. 699, 187 S.E.2d 188 (1972). There is no preclusive language in the statute barring introduction of the reports if the investigating official testifies; we decline to construe the statute to require an election by the Commonwealth to introduce the relevant evidence either by a qualified witness or by the written reports.

As to the hearsay objection, we hold that any error in admitting portions of the report containing inadmissible opinions, *Ward v. Commonwealth,* 216 Va. 177, 217 S.E.2d 810 (1975), was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, *reh. denied,* 386 U.S. 987 (1967). There was nothing of substance in the reports that unchallenged evidence had not already made a part of the record. Fitzgerald's defense was that he did not commit the capital murder, or, if he did, that because of drugs and alcohol he did not have the requisite intent

and could not be held legally responsible. He did not deny that multiple stab wounds caused Cubbage's death, or that she was abducted and killed during the commission of rape and robbery. He merely denied that he was the culprit.

### B. Whether as a Matter of Law Fitzgerald Lacked the Intent to Commit Capital Murder.

The trial court gave Instruction No. 26, which informed the jury that if it found that Fitzgerald was "so greatly intoxicated by the voluntary use of alcohol and/or drugs that he was incapable of deliberating or premeditating" he could not be found guilty of either capital murder or murder in the first degree. Fitzgerald says that the court should have ruled as a matter of law that he was incapable of deliberating or premeditating. We do not agree.

One who is so greatly intoxicated as to be unable to deliberate and premeditate cannot be convicted of a class of murder that requires proof of a willful, deliberate, and premeditated killing. *Johnson* v. *Commonwealth,* 135 Va. 524, 531, 115 S.E. 673, 675-76 (1923). Mere intoxication from drugs or alcohol, however, is not sufficient to negate premeditation. *Giarratano* v. *Commonwealth,* 220 Va. 1064, 1073, 266 S.E.2d 94, 99 (1980). In the present case, as in *Giarratano,* there was evidence that the defendant was intoxicated from drugs or alcohol, or the combined effect of both. There was also evidence from which the jury reasonably could find that Fitzgerald was in full control of his faculties and knew exactly what he intended to do.

Fitzgerald's complaints about Cubbage on the ride back from the Bradleys', his announced intention to "finish the job" rather than take Cubbage to a hospital, his instructions to Johnson to assist Cubbage and to drive on a specified route to the remote spot where she was slain, and his actions after the killing were evidence that he was in command of the criminal enterprise and carried out a planned operation. Fitzgerald arranged for his clothes and those of Johnson to be washed, and he insisted upon tattooing a mark on Johnson's arm to establish that, by accompanying Fitzgerald on this night of violence, Johnson had earned admission to the company of outlaws. Moreover, the testimony of Caviness, if believed, supplied not only a tacit admission by Fitzgerald that he had mutilated and killed Cubbage, but a motive for his doing so.

Dr. Blanke testified that a person could not have been caused to perpetrate the acts described in the hypothetical question by LSD,

Tranxene, or alcohol, or a combination of the three. Dr. Lordi, the expert defense witness, could not say that a person who had ingested quantities of LSD, Tranxene, and alcohol was incapable of premeditating and intending his act. Thus, Fitzgerald's condition was an issue of fact to be resolved by the jury and there was ample evidence to support the jury's finding that he had the requisite capacity to commit the capital murder.

## C. Instructions.

### 1. Instruction No. 9.[3]

 Fitzgerald was charged under Code § 18.2-48 with abduction of Cubbage "with the intent to defile" her. In Instruction No. 9, the trial court used the words "with the intent to sexually molest" in lieu of the statutory language of intent. Fitzgerald contends, as he did at trial, that the instruction should have followed the language of the statute. He says that the trial court broadened the definition of "defile" by giving the instruction as drafted.

The instruction, proffered by the Commonwealth, was based upon a model instruction. 1 Virginia Model Jury Instructions - Criminal 79 (Supp. 1, 1980). The drafters of the model instructions stated in their explanatory comment that older definitions of defilement are susceptible of several meanings but, since "the modern legal meaning seems restricted to sexual relations," the drafters used "sexually molest" as the functional equivalent of "defile." *Id.* at 80. We agree that the terms are interchangeable within the meaning of the statute.

It is permissible of course to draft instructions in the language of the applicable statute, but it is not obligatory to do so if the meaning of the law is not changed by the language used. *See Banner* v. *Commonwealth,* 204 Va. 640, 646, 133 S.E.2d 305, 309 (1963). A jury may not understand the meaning of "defile" as

---

[3] Instruction No. 9 provided in pertinent part:

The defendant is charged with the crime of abduction with intent to defile. Kidnapping and abduction are the same crime. The Commonwealth must prove beyond a reasonable doubt each of the following elements of the crime:

(1) That the defendant by force or deception did seize, take, transport and detain Patricia Cubbage; and

(2) That the defendant did so with the intent to sexually molest Patricia Cubbage; and

(3) That the defendant acted without legal justification or excuse.

\* \* \*

well as the more precise words "sexually molest." In this instance, we approve the instruction recommended by the drafters of the model instructions and given by the trial court.

## 2. Instruction No. 28.[4]

 Fitzgerald says that Instruction No. 28 was confusing, misleading, incomplete, ambiguous and unsupported by any indictment or evidence. In the colloquy at the time the instruction was tendered, the Commonwealth Attorney explained that he offered the instruction because Fitzgerald could be found to be a principal in the second degree to capital murder, but as such he could be convicted of only first-degree murder, since a principal in the second degree cannot be convicted of capital murder. *See Johnson* v. *Commonwealth,* 220 Va. 146, 255 S.E.2d 525 (1979). As an abstract statement of the law, the instruction was not incorrect.

We express no opinion as to the necessity for granting this or any other instruction defining principals in the second degree, in view of the evidence in this case. However, we can perceive only benefit, rather than prejudice, to Fitzgerald from the instruction. It injected a diluting element into the legal principles controlling the jury's consideration of the evidence relating to Fitzgerald's role in the slaying. It required the jury to find, in respect to noncapital charges, that Fitzgerald was guilty even if he was found to be only a principal in the second degree, but, in respect to the capital charge, it permitted the jury to find that he was not guilty of capital murder if he was found not to be the one who struck the blows that killed Cubbage.

---

[4] Instruction No. 28 provided:

A principal in the first degree is the person who actually commits the crime. In a capital murder case *only* the principal in the first degree can be convicted of capital murder. A principal in the second degree is a person who is present, aiding and abetting, by helping in some way in the commission of the crime. Presence or consent alone are not sufficient to constitute aiding and abetting. It must be shown that the defendant intended his words, gestures, signals or actions to in some way encourage, advise, or urge, or in some way help the person committing the crime to commit it.

A principal in the second degree is liable for the same punishment as the person who actually committed the crime, except that a principal in the second degree cannot be guilty of capital murder. The Commonwealth must prove beyond a reasonable doubt that the defendant is a principal in the second degree.

If you find the Commonwealth has failed to prove any one or more of the elements of the offense beyond a reasonable doubt, then you shall find the defendant not guilty.

## C. Double Jeopardy.

After Fitzgerald was convicted of capital murder and the non-capital offenses with which he was charged, he moved the trial court to vacate, on double-jeopardy grounds, the sentences imposed upon him by the jury for rape and robbery. The motion was denied.

Fitzgerald argues that his right under the Double Jeopardy Clause of the Fifth Amendment was violated when he was sentenced for the felonies underlying his conviction of capital murder. He now asks that his convictions for rape and robbery be set aside on the basis of double jeopardy, and that all his other convictions be set aside because a reasonable doubt exists whether the multiple convictions improperly influenced the jury in arriving at the death sentence. He relies on *Blockburger* v. *United States,* 284 U.S. 299 (1932), and, even more heavily, on *Harris* v. *Oklahoma,* 433 U.S. 682 (1977) (per curiam).

In *Harris,* the defendant was convicted of felony-murder, which in Oklahoma at that time consisted of murder in the course of "robbery with firearms." 433 U.S. at 682. Following this conviction, the defendant was brought to trial a second time on an indictment charging him with the underlying robbery. The Court noted that under Oklahoma law robbery with firearms was a lesser-included offense of felony-murder in the course of robbery with firearms and held that the "Double Jeopardy Clause bars prosecution for the lesser crime after conviction of the greater one." *Id.* at 682-83.

*Harris* is inapposite. In *Brown* v. *Ohio,* 432 U.S. 161 (1977), decided the same term as *Harris,* the Court repeated that the Double Jeopardy Clause affords protection in three different instances: (1) It " 'protects against a second prosecution for the same offense after acquittal. [(2)] It protects against a second prosecution for the same offense after conviction. [(3)] And it protects against multiple punishments for the same offense.' " 432 U.S. at 165, quoting *North Carolina* v. *Pearce,* 395 U.S. 711, 717 (1969). Both *Brown* and *Harris* involved protection (2) above, the purpose of which is to guarantee "a constitutional policy of finality for the defendant's benefit." *Brown,* 432 U.S. at 165, citing *United States* v. *Jorn,* 400 U.S. 470, 479 (1971) (plurality opinion). The present case, however, involves protection (3) in a single trial, where "the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization

by imposing multiple punishments for the same offense." *Id.; Blythe* v. *Commonwealth,* 222 Va. 722, 725, 284 S.E.2d 796, 798 (1981). *See Whalen* v. *United States,* 445 U.S. 684 (1980), where the Court found that the legislature (Congress) had provided a statute[5] evincing a legislative intent to codify "the Blockburger test."[6]

We have used the *Blockburger* test on numerous occasions to resolve double jeopardy issues where the defendant was convicted at a single trial of multiple offenses arising out of the same transaction and the authorized legislative punishments were less than plain. *See Blythe; Jones* v. *Commonwealth,* 218 Va. 18, 235 S.E.2d 313 (1977); *Epps* v. *Commonwealth,* 216 Va. 150, 216 S.E.2d 64 (1975); and cases therein cited. However, we have found it unnecessary to apply *Blockburger* where the General Assembly has "clearly indicated its intent to impose multiple punishments." *Turner* v. *Commonwealth,* 221 Va. 513, 530, 273 S.E.2d 36, 47 (1980), *cert. denied,* 451 U.S. 1011 (1981).

■ An examination of the statutes relevant to the present appeal convinces us that this case stands on the same footing as *Turner.* Code § 18.2-31, defining capital murder, was first enacted by the General Assembly in 1975 as part of a statutory scheme enacted to eliminate the "unbridled choice between the death penalty and a lesser sentence" prohibited by *Furman* v. *Georgia,* 408 U.S. 238 (1972). *Smith* v. *Commonwealth,* 219 Va. 455, 473, 248 S.E.2d 135, 146 (1978), *cert. denied,* 441 U.S. 967 (1979); *see also Whitley* v. *Commonwealth,* 223 Va. 66, 77, 286 S.E.2d 162, 168 (1982). In 1976, the General Assembly added subsections (d) and (e) to § 18.2-31. These subsections expanded the definition of capital murder to include the "willful, deliberate and premeditated killing" of any person "in the commission of, or subsequent to, rape," and "in the commission of robbery while armed with a deadly weapon." Acts 1976, c. 503.

---

[5] District of Columbia Code § 23-112 provided that sentences run consecutively for offenses arising out of the same transaction unless the trial court directs otherwise or one offense "requires proof of a fact which the other does not."

[6] In determining whether Congress authorized separate punishments for multiple drug offenses arising from a single narcotics transfer, the Court in *Blockburger* stated: "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not." (Citations omitted). 284 U.S. at 304.

Prior to 1975, murder of the first degree was punishable by death, or by confinement in prison from twenty years to life. Code § 18.1-22 (Repl. Vol. 1960) and predecessor statutes. First-degree murder was defined as "[m]urder by poison, lying in wait, imprisonment, starving, or by any wilful, deliberate, and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary." Code § 18.1-21 (Repl. Vol. 1960) and predecessor statutes. All other murder was murder of the second degree. *Id.*

The first-degree murder statute and its death sanction dated from 1796. Acts 1796, c. 2, §§ 1-2, 4. In that year the General Assembly enacted statutes to mitigate the harshness of the common law which punished murder and numerous other crimes with death. Thus, Act 1796, c. 2, § 1, abolished the death penalty except for crimes specifically denoted by an Act of Assembly. Finding "the several offences which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment," the General Assembly fixed gradations of murder, Acts 1796, c. 2, and provided the death penalty only for murder of the first degree.

Subsequent amendments to the murder statutes, including those enacted in response to *Furman* in 1975, have changed the substance and the procedure of the statutes, but not their evident purpose. That purpose is gradation. The General Assembly grades murder in order to assign punishment consistent with prevailing societal and legal views of what is appropriate and procedurally fair.

The overriding purpose of the murder statutes being gradation, we can divine no legislative intent to eliminate punishment for other offenses included in the murder statutes solely for the purpose of categorizing the murder. The legislature has granted authority for the punishment of rape, Code § 18.2-61, and robbery, Code § 18.2-58. Moreover, in Code § 19.2-308 the General Assembly has provided, "When any person is convicted of two or more offenses, and sentenced to confinement, such sentences shall not run concurrently, unless expressly ordered by the court." *Cf.* D. C. Code § 23-112, *supra,* n.5. In the face of the current statutory scheme and its legislative history, we can not say that the legislature intended any elimination of underlying sentencing au-

thority for rape and robbery when it modified the murder statutes in 1975, or on any prior occasion.

A contrary conclusion would create disorder and anomalous results in punishments, which the General Assembly will not be presumed to have intended. For example, a person convicted of armed robbery and second-degree murder arising out of a single transaction might receive a life sentence for the robbery and twenty years in prison for the murder. His cohort convicted of capital murder or first-degree murder (felony-murder) in the commission of armed robbery might receive a life sentence for the murder but nothing for the robbery. In this instance, the less culpable criminal would receive the greater punishment as the sole result of a statutory scheme theoretically aimed at rational gradation.

For the foregoing reasons, we hold that the imposition of sentences against Fitzgerald for the rape and robbery underlying his capital murder conviction did not violate the Double Jeopardy Clause.

### D. Conflict of Interest.

On November 17, 1980, the General District Court entered an order appointing Fred S. Hunt, III, counsel for Fitzgerald. By order entered February 24, 1981, on motion of Fitzgerald, by Hunt, his attorney, reciting the seriousness of the charges and complexity of the case, the General District Court appointed Harold W. Burgess, Jr., as an additional attorney to represent Fitzgerald.

At a hearing on other matters held on July 9, 1981, the trial court asked Fitzgerald if he was satisfied with the services of his attorney. Fitzgerald replied that he was. The court then informed Fitzgerald that one of his attorneys, Hunt, was married to an Administrative Assistant in the office of the Commonwealth Attorney. Fitzgerald said that he had not known this before, but that he was ready for trial, and was satisfied with the services of his attorney. At the beginning of his trial on July 14, 1981, Fitzgerald again, in answer to the court's questions, said that he was satisfied with the services of Messrs. Hunt and Burgess, that all his witnesses were present, and that he thought that everything that should have been done had been done to prepare his case for trial.

After his conviction and sentencing, Fitzgerald wrote a letter to the trial court requesting new attorneys. At a hearing, Fitzgerald

told the court that because of Mrs. Hunt's employment he did not believe Hunt was impartial. The court stated that Hunt had "represented him ably," but appointed new counsel to represent Fitzgerald on appeal.

In oral argument before us, Fitzgerald's counsel expressly repudiated any suggestion that there was actual conflict of interest in Hunt's representation of Fitzgerald, that Hunt's representation had been ineffective, or that Hunt had acted otherwise than in what he believed were Fitzgerald's best interests. Counsel could only argue that Hunt's situation projected the appearance of a potential conflict of interest that in some mysterious way tainted his conduct of the defense. Relying on *Smith* v. *Phillips,* 455 U.S. 209 (1982), he argued that the court violated Fitzgerald's Sixth Amendment rights to counsel by not inquiring *sua sponte* to determine whether Hunt could be impartial and effective.

We reject this argument. *Smith* is inapposite. It merely holds that prosecutorial misconduct requires a hearing when it involves potential juror bias. *Id.* at 215. The trial court informed Fitzgerald about Mrs. Hunt's employment, and Fitzgerald expressed his satisfaction with the services of his attorneys until some weeks after his trial had ended in his convictions and sentencing. He has never suggested any logical reason why Mrs. Hunt's employment in the Commonwealth Attorney's office could have compromised Hunt or prejudiced Fitzgerald. It would be more logical to believe that Hunt might obtain from his wife information that would be of assistance to him in defending Fitzgerald. As an attorney in private practice, Hunt had a reputation to establish or enhace by vigorously defending any indigent whom he was appointed to represent. Anything less than a dedicated, thorough, and aggressive effort to the best of his ability would be detrimental to his law practice. Moreover, Fitzgerald had no complaint against Burgess, who also represented Fitzgerald and took an active part in the trial. On the face of the record, there is no evidence of a potential conflict of interest on the part of Hunt requiring any inquiry by the trial court. To the contrary, the record shows that Hunt conducted himself throughout the trial with undeviating loyalty to his client.

## III. The Sentencing Trial.

### A. Constitutionality of the Capital Murder Statute.

■ Fitzgerald challenges the facial constitutionality of the capital-murder statute under the Fifth and Fourteenth Amendments to the Constitution of the United States and Article One, Section Two of the Constitution of Virginia. He acknowledges that we have rejected such arguments in previous cases, beginning with *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135, *cert. denied,* 441 U.S. 967 (1979), and continuing through *Evans* v. *Commonwealth,* 222 Va. 766, 284 S.E.2d 816 (1981). *See also Clanton* v. *Commonwealth,* 223 Va. 41, 286 S.E.2d 172 (1982). We reaffirm the views that we expressed in those cases.

## IV. Appellate Review.[7]

### A. Whether the Sentence of Death Was Arbitrarily Imposed.

■ Fitzgerald argues that the cumulative effect of the errors assigned, which we have heretofore discussed, may have unduly influenced the jury, and that further undue influence may have resulted from the multiple convictions. In *Waye* v. *Commonwealth,* 219 Va. 683, 704, 251 S.E.2d 202, 214, *cert. denied,* 442 U.S. 924 (1979), we rejected the substance of this argument that the sum of numerous alleged errors that we have found to be meritless constituted reversible error; we reject the argument here.

### B. Whether the Sentence of Death was Excessive or Disproportionate.

■ Although he assigned it as error, Fitzgerald did not argue on brief or before us that the sentence of death imposed upon him was excessive or disproportionate. Nevertheless, under the mandate of Code § 17-110.1(C) it is our duty to consider and determine this question.

■ Under Code §§ 19.2-264.2 and 19.2-264.4(C), a jury may impose the death sentence upon either of the alternative findings

---

[7] Code § 17-110.1(C) requires that in addition to considering errors assigned to the conduct of the trial we consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and
2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

therein provided, *i.e.,* the probability, based on his record, that the defendant will be a continuing threat to society, or the vileness of the capital murder itself. In the present case, the jury based its verdict upon the finding that Fitzgerald's conduct in committing the capital murder of Cubbage was "outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim."

We have examined the records in all the capital murder cases reviewed by this Court. We have upheld the imposition of the death sentence in *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 207, *cert. denied,* 442 U.S. 924 (1979) (rape), *Justus* v. *Commonwealth,* 222 Va. 667, 283 S.E.2d 905 (1981) (rape), *Coppola,* 220 Va. 243, 257 S.E.2d 797 (1979), *cert. denied,* 444 U.S. 1103 (1980) (robbery), and *Whitley,* 223 Va. 66, 286 S.E.2d 162 (1982) (robbery), where the sentences were based solely upon findings of vileness in the commission of the crimes. In *Waye,* the defendant had bitten and repeatedly stabbed his victim. In *Justus,* the defendant had shot his victim, who was eight and a half months pregnant, twice in the face and once in the back of the head. In *Coppola,* the defendant repeatedly beat the head of his victim against the floor, breaking her teeth, choking her, and eventually killing her. In *Whitley,* the defendant manually strangled his victim, strangled her with a rope, and cut her throat.

The vileness of Fitzgerald's capital murder of Cubbage exceeded that of any of the cases which we have reviewed. The systematic torturing of his victim by slashing her with a machete and a knife, followed by comprehensive mutilation, reflected relentless, severe, and protracted physical abuse inflicted with brutality and ferocity of unparalleled atrociousness. We hold that the sentence of death is not excessive or disproportionate to sentences generally imposed by Virginia juries in crimes of a similar but less horrifying nature.

We have found no reversible error in the rulings of the trial court, and we have independently determined that the sentence of death was properly imposed. Therefore, we decline to disturb or commute the sentence, and we will affirm the judgment of the trial court.

*Affirmed.*