JOSEPH D. MORRISSEY

V.

VIRGINIA STATE BAR

Record No. 940374

September 16, 1994

Present: All the Justices

*Larry D. Catlett (Catlett & Kaplan*, on briefs), for appellant.

*W. Mark Dunn, Assistant Attorney General (James S. Gilmore, III, Attorney General; Gregory E. Lucyk, Senior Assistant Attorney General*, on brief), for appellee.

JUSTICE WHITING delivered the opinion of the Court.

This case was heard on an amended complaint filed by the Virginia State Bar charging Joseph Dee Morrissey, then the Commonwealth's Attorney for the City of Richmond, with violations of a number of disciplinary rules in connection with his prosecution of felony charges against Robert William Molyneux, III. Although the trial court dismissed a number of the charges, it found that Morrissey violated the following disciplinary rules:

DR 1-102 *Misconduct.*—

(A) A lawyer shall not:

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation which reflects adversely on a lawyer's fitness to practice law.

DR 8-101 *Action as a Public Official.*—

(A) A lawyer who holds public office shall not:

. . . .

(3) Accept anything of value from any person when the lawyer knows or it is obvious that the offer is for the purpose of influencing his action as a public official.

Accordingly, the court ordered that Morrissey's license to practice law be suspended for six months. Morrissey appeals, and the State Bar assigns cross-error.

Molyneux was charged with the abduction and rape of Debra Jean Nuckols in Richmond. Molyneux's father employed James S. Yoffy, a Richmond attorney, to represent Molyneux, who was indigent.

Nuckols and Molyneux each gave inconsistent statements concerning the incident. At first, Nuckols claimed that she did not know Molyneux before he accosted and raped her in an alley as

she was walking home from a Richmond night club in the early morning hours of June 9, 1991; however, Nuckols later admitted that she had danced with Molyneux while she was in the night club and had agreed to let him accompany her as she walked home. Molyneux also initially denied having had sexual intercourse with Nuckols, but when DNA tests later indicated the presence of his semen on Nuckols's underpants, he admitted commission of the act, but claimed it was consensual.

Independent DNA tests of Nuckols's clothing, arranged by Yoffy and paid for by Molyneux's father, produced other apparent inconsistencies in Nuckols's version of the incident. Nuckols claimed that she had not had sexual intercourse in the five weeks preceding her alleged rape by Molyneux, yet the DNA tests of semen samples found in her underpants disclosed the presence of semen from Molyneux and another male. Further, Nuckols said that Molyneux had urinated on her during the incident, but chemical tests failed to disclose the presence of urine on Nuckols's clothing.

Recognizing the problems in their respective cases, the two attorneys began to explore the possibility of a plea agreement. After Morrissey alluded to the cost to Molyneux's father of investigating Molyneux's case, Yoffy approached Morrissey about the possibility of settlement of the felony charges on an "accord and satisfaction" basis. In exchange for a *nolle prosequi* of the abduction charge and a reduction of the rape charge to a charge of sexual battery, a misdemeanor, Molyneux was willing to agree to a 12-month sentence on the misdemeanor. The sentence was to be suspended upon the condition of his payment of court costs and completion of a period of probation, community service, and psychiatric counselling.

Additionally, Yoffy suggested that Molyneux would pay the victim "for her alleged damages," although no specific amount was discussed. According to Yoffy, Morrissey "liked the idea," but told Yoffy that he did not think that Nuckols would settle for less than $25,000. Further, Morrissey said that if Nuckols "was going to get some money then the Commonwealth is going to get something out of it and [Morrissey] wanted $25,000" as partial funding of a television program called "Prosecutor's Corner." Explaining the program to Yoffy, Morrissey said that he "would be the focal point and he would have guests on, [to] explain prosecution oriented issues." Believing that this was an inappropriate use of

the money, Yoffy told Morrissey that "perhaps a charity would be a better beneficiary than something more related to him."

In a later meeting, Yoffy told Morrissey that "a charity was acceptable to my client and that I had $50,000 to work with." Morrissey then told Yoffy that if the parties agreed to a settlement, Morrissey wanted the Commonwealth's share of the money to be contributed to several charities which he would select.

At Yoffy's request, Morrissey arranged to meet with Nuckols and Yoffy so that Yoffy could offer Nuckols $25,000 as an "accord and satisfaction." Before this meeting, Morrissey asked Yoffy not to tell Nuckols about the additional $25,000 to be paid to the charities.

At the time of the meeting, Nuckols was aware of all the conditions of the proposed plea agreement, except the proposed charitable contributions by Molyneux's father. During the meeting, Morrissey made it clear that if Nuckols accepted the offer, the criminal charges would be disposed of by plea agreement; however, if she rejected the offer, the charges would be prosecuted. After pointing out to Nuckols some of the inconsistencies in her statements, Yoffy "offered her $25,000 to settle the case." Yoffy was asked to leave the room so that Nuckols could discuss the matter with Morrissey.

Upon being asked his opinion of the offer, Morrissey told Nuckols that if she "were his sister that he would strongly suggest to her that she consider the offer." When Nuckols later indicated that she would consider an offer of $100,000, Morrissey replied that "the offer was not up for negotiation." After hearing that Nuckols had rejected his offer, Yoffy suggested a reduction of the charities' share with a corresponding increase of Nuckols's share. Morrissey rejected this idea, insisting that the Commonwealth receive an equal amount of the settlement.

Thereafter, in preparation for the felony trial, Yoffy filed a motion *in limine* to obtain a ruling regarding the introduction of a psychiatrist's opinion indicating that Nuckols "could very well have made this attack up" because of a mental illness that had occurred five years earlier. Although Morrissey advised Yoffy that he did not plan to have Nuckols testify in the hearing on his motion, Morrissey told Yoffy that he planned to have her there "so she could appreciate what it would be like to be a witness and what evidence might come in against her."

At the hearing on August 18, 1992, Nuckols found the psychiatrist's testimony regarding her psychiatric past "very painful" and she was "devastated at the thought that it could be used at the actual trial." When the Honorable Thomas N. Nance, the judge presiding at the hearing and the subsequent criminal trial, told the lawyers in a side-bar conference that the evidence would not be admitted, Yoffy asked the court to withhold its ruling because the lawyers were negotiating "civil aspects" of the case. Judge Nance withheld a formal ruling and also indicated to the lawyers that he "[did not] want to hear anything about . . . a civil case."

After the hearing, when Nuckols asked Morrissey whether the psychiatric evidence would be admissible, Morrissey responded that he did not know. Nuckols then asked Morrissey if he thought that the offer of settlement was still available. Later, Morrissey called Nuckols and told her that the offer was still available and that he had "basically settled it on [her] behalf." At Morrissey's request, Nuckols wrote him a letter indicating that the Commonwealth was "ready to go forward with the case but I wanted to accept the offer and to thank them for their support."

Shortly thereafter, Molyneux, Yoffy, and Morrissey appeared before Judge Nance to obtain court acceptance of their plea agreement. Moments before that hearing, Morrissey asked Yoffy not to tell the court about the part of the agreement relating to the proposed contributions of Molyneux's father to charities of Morrissey's choice.

At the hearing, Morrissey proffered the Commonwealth's evidence and advised the court of all the terms of the plea agreement except for the father's $25,000 payments to Nuckols and to the charities. Acting on this information and Molyneux's guilty plea to the misdemeanor of sexual battery, the court found Molyneux guilty, sentenced him, and suspended the sentence upon the conditions disclosed to the court by Morrissey. The court also sustained the Commonwealth's motion to *nolle prosequi* the abduction charge. Thereafter, Molyneux's father delivered $50,000 to Yoffy in accordance with the agreement.

The following principles govern the disposition of this case. First, in this civil proceeding to discipline a lawyer, the State Bar has the burden of proving its case by "clear proof." *Seventh Dist. Comm. v. Gunter*, 212 Va. 278, 284, 183 S.E.2d 713, 717 (1971). Second,

on review we will make an independent examination of the whole record, giving the factual findings . . . substantial weight and viewing them as prima facie correct. While not given the weight of a jury verdict, those conclusions will be sustained unless it appears they are not justified by a reasonable view of the evidence or are contrary to law.

*Blue v. Seventh Dist. Comm.*, 220 Va. 1056, 1061-62, 265 S.E.2d 753, 757 (1980). Finally, we view the evidence in the light most favorable to the party prevailing in the court below. *Gunter v. Virginia State Bar*, 238 Va. 617, 619, 385 S.E.2d 597, 598 (1989).

Applying these principles in our independent examination of the whole record, we conclude that the trial court correctly decided the issues presented in this appeal.

## I

### *Morrissey's Violation of DR 1-102(A)(4)*

█ As we have pointed out, "concealment," designed to mislead another, is " 'conduct involving dishonesty, fraud, [or] deceit' " under DR 1-102(A)(4). *Gunter*, 238 Va. at 622, 385 S.E.2d at 600. Morrissey deliberately concealed from Nuckols the fact that Molyneux was willing to pay up to $50,000 as a part of the plea agreement. This concealment deprived Nuckols of the opportunity to negotiate a larger share of the settlement.

█ Further, Morrissey misled Nuckols into believing that the psychiatric evidence might be admissible in order to influence her to settle for $25,000. Responding to Nuckols's question on that subject, Morrissey told her that he did not know whether such evidence would be admitted, although Judge Nance had just told the lawyers otherwise. Relying upon Morrissey's misrepresentation, Nuckols changed her mind about going forward with the criminal prosecution, reduced her demand, and settled her civil case for a sum she had previously rejected.

█ Because he was not Nuckols's attorney, Morrissey contends that neither of these acts violated DR 1-102(A)(4). We do not agree with Morrissey's myopic view of his ethical duties. An attorney's duty not to practice deceit or misrepresentation is not confined to dealings with his clients; it also extends to others who may be adversely affected by such conduct. *See Gunter*, 238 Va. at 622, 385 S.E.2d at 600 (DR 1-102(A)(4) applied to attorney en-

gaged in deceit by authorizing surreptitious recordation of opposing litigant's telephone conversations).

■ Next, we consider the concealment charge arising out of Morrissey's presentation of the plea agreement to Judge Nance for his acceptance. We conclude that Morrissey concealed an important fact from Judge Nance—the $25,000 charitable contributions to be made by Molyneux's father.[1] Indeed, when the plea agreement was presented, not only did Morrissey deliberately conceal the contributions from the court, he also asked Yoffy not to disclose them to the court.

Although Morrissey concedes he would have been required to disclose the contributions to the court had Molyneux pled guilty to a felony, he contends their disclosure was not required because Molyneux pled guilty to a misdemeanor. We do not agree.

■ The authorization and procedure for plea agreements in felony and misdemeanor cases is set forth in Rule 3A:8(c). Although misdemeanor plea agreements are not required to be in writing, the Rule requires that counsel make full disclosure to the court of all terms of such agreements. In pertinent part, Rule 3A:8(c)(2) provides that "[t]he court shall require the disclosure of the agreement in open court . . . at the time the plea is offered." Full disclosure of the terms of plea agreements is essential in order that trial courts may properly determine whether to accept or reject such agreements. *See Gardner v. Warden*, 222 Va. 491, 494, 281 S.E.2d 876, 878 (1981) (to decide whether guilty plea is voluntary, trial court must be advised of any promises made to induce plea); *Hairston v. Commonwealth*, 16 Va. App. 941, 945, 434 S.E.2d 350, 353 (1993) (Rule designed to ensure that plea agreements are fully disclosed to trial court and defendant).

Next, Morrissey attempts to justify his intentional concealment by recounting a version of Judge Nance's remark to the effect that he did not want to hear anything about money to be paid in a "civil restitution." Morrissey's interpretation of Judge Nance's remarks is inaccurate.

■ When Yoffy asked the court to withhold its ruling during the August 20 hearing because the lawyers were negotiating "civil aspects" of the case, Judge Nance testified that "I said I didn't

---

[1] Morrissey also withheld from Judge Nance information of the $25,000 payment to be made to Nuckols. In view of our decision regarding the $25,000 charitable contribution, we need not decide whether Morrissey's nondisclosure of the payment to Nuckols was a violation of DR 1-102(A)(4).

want to hear anything about it." Judge Nance concluded his testimony on this issue by stating "[t]he rules are [that] I am not allowed to engage in the negotiating process. That's between the lawyers. If I don't like it I can turn it down." Further, Judge Nance testified that "[i]f anything had been mentioned about money the antenna would have gone up. I would have looked into it." In our opinion, this evidence indicates that Judge Nance simply refused to be involved in the negotiations, but he gave no indication that he did not want to be advised of all the terms of the plea agreement when it was presented to him for approval.

Nor do we agree with Morrissey's contention that the $25,000 charitable contributions can be considered "civil restitution." Finally, even if, as Morrissey suggests, some prosecutors have engaged in the practice of requiring charitable contributions from accused persons or their families as a condition to plea agreements, we reject Morrissey's contention that a prosecutor is not required to inform the sentencing court of any such condition.[2]

Accordingly, we find no merit in Morrissey's contentions that he did not violate DR 1-102(A)(4).

## II

### Morrissey's Violation of DR 8-101(A)(3)

The evidence is clear that the charitable contributions were made to influence Morrissey's action as Commonwealth's Attorney in the plea bargaining process. The issue here is whether these payments constituted something of value to Morrissey in violation of DR 8-101(A)(3).

Initially, Morrissey contends that the State Bar has stipulated that he received nothing of value for the payment. Morrissey maintains that the stipulation was contained in the State Bar's agreement to his counsel's proffer that representatives of the various charities would testify that Morrissey neither asked for nor received any benefit for the contributions. However, whether Morrissey received a benefit for the contributions was a conclusion, and the State Bar did not stipulate the correctness of the witnesses' conclusions. Indeed, the correctness of those conclusions is a matter to be determined by the courts after considering all the evidence.

---

[2] Because the question is not before us, we do not consider the propriety of requiring defendants or their families to make such contributions.

At the time of the plea bargaining negotiations in the summer of 1992, Morrissey knew that he would face a reelection campaign in 1993. When Yoffy rejected Morrissey's proposal to use the $25,000 for the television program "Prosecutor's Corner" and told Morrissey that "a charity" would be acceptable to his client, Yoffy had planned to have Molyneux's father make the charitable contributions himself in order to qualify for a tax deduction. However, during the negotiations, Yoffy got the impression that Morrissey wanted Yoffy to make the contributions from the father's funds, and that such contributions would be made to several major charities named by Morrissey.

After Molyneux was convicted and the money had been deposited with Yoffy, Morrissey directed Yoffy to make the first disbursement of $7,000 by having cashier's checks prepared to eight local charitable organizations in sums ranging from $250 to $2,000 and delivering those checks to Morrissey's office. When Yoffy expressed his concern that Morrissey was planning to use the checks for political purposes, Morrissey responded, "[w]e've got a deal and you better live up to it." Yoffy took this statement as a threat that Morrissey might have Molyneux re-indicted on the abduction charge that had been nol-prossed pursuant to the plea agreement. Accordingly, at Morrissey's direction, Yoffy issued and delivered to Morrissey 47 checks totalling nearly $25,000 payable to the various charities named by Morrissey. Almost all the charities were located in Richmond.

Morrissey's letters reflected a number of methods by which he delivered these checks and informed each charity that he had chosen it as the recipient of a donation from an anonymous donor. In one instance, Morrissey confirmed by letter to the pastor of one church in Richmond that a $2,000 donation "by an anonymous donor" had been delivered by Morrissey during his visit to the church the preceding Sunday and "[a]s I indicated in my brief remarks, I was given the donation and allowed to make it to the charity of my choice." In other instances, Morrissey mailed the checks following telephone conversations with representatives of the charities, or simply mailed the check with a cover letter, but Morrissey never failed to let the donee charity know that he had selected that charity as the donee of the gift.

In our opinion, Morrissey's carefully orchestrated scheme was designed to secure something of value to Morrissey—the possibility that members of the donee charities would express their

gratitude in the form of political support in the forthcoming election. Accordingly, we conclude that the evidence clearly supports the trial court's conclusion that Morrissey violated DR 8-101(A)(3).

## III

### *The Bar's Assignment of Cross-Error*

█ The bar contends that the trial court erred in failing to find that Morrissey's actions were also in violation of DR 1-102(A)(3), which provides that "[a] lawyer shall not . . . [c]ommit a crime or other deliberately wrongful act that reflects adversely on the lawyer's fitness to practice law." Although Morrissey's concealments were deliberate and wrongful, we do not think that the language of DR 1-102(A)(3) indicates a clear intent to provide multiple punishment for such acts under the circumstances of this case. *See Fitzgerald v. Commonwealth*, 223 Va. 615, 635, 292 S.E.2d 798, 810 (1982), *cert. denied*, 459 U.S. 1228 (1983) (defendant can be convicted of multiple offenses arising out of same transaction if legislature clearly indicates its intent to impose multiple punishments). Accordingly, we conclude that the trial court correctly dismissed this charge.

Therefore, the judgment of the trial court will be

*Affirmed.*

JUSTICE COMPTON, with whom JUSTICE STEPHENSON joins, dissenting.

The majority must have read a record of the proceedings in this case different from the one that I reviewed. Assuming we all have reviewed the same record, the majority has put a twist on the evidence that is unwarranted and at odds with an objective, appellate analysis of this case.

The majority has concluded that Morrissey violated Disciplinary Rule 1-102(A)(4) requiring a lawyer not to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on a lawyer's fitness to practice law. This conclusion of the majority has two bases. First, Morrissey failed to make full disclosure to the crime victim that $50,000 might be available to settle her civil claim. Second, Morrissey failed to dis-

close to the criminal trial judge the full details of the plea agreement. I can agree that, given the relationship Morrissey assumed with the victim in his capacity as prosecutor, he probably should have made a fuller disclosure to her about the settlement offer. And, I can probably agree that this failure to disclose amounts to conduct involving misrepresentation that is violative of DR 1-102(A)(4). I cannot agree, however, that the second basis for the majority's holding is supported by the record.

The evidence is uncontradicted that the criminal trial judge, when informed that the defendant's attorney and Morrissey were "negotiating a civil aspect" of the criminal charge, said: "I don't want to hear any of the details of it. . . . I don't want to hear any of that, any of the facts and circumstances." During his testimony in the disbarment proceeding, the judge, when asked whether he made the foregoing responses upon being informed about a "civil resolution to the case," stated: "I don't ever want to hear anything about a civil settlement." Later during his testimony, the judge indicated that if "anything had been mentioned about money the antenna would have gone up. I would have looked into it."

This evidence clearly shows that the judge unmistakably communicated to the attorneys his reluctance to consider the details of a civil settlement, thus justifying Morrissey's failure to pursue the matter with the court. Nevertheless, the majority twists this set of facts to find that Morrissey violated *by his silence* the ethical rule that he not engage in conduct involving misrepresentation. I believe this is an unwarranted view of the evidence and I would reverse the disbarment court's finding insofar as it relied on this second basis.

The majority also has concluded that Morrissey violated Disciplinary Rule 8-101(A)(3) providing that a lawyer who holds public office shall not accept anything of value from any person when it is obvious that the offer is made for the purpose of influencing the lawyer's action as a public official. All lawyers who are elected representatives serving in state and local government, and who receive campaign contributions, should pay close attention to this ruling.

The majority has concluded that Morrissey received a benefit from the charitable donations *despite the stipulation between the parties to the contrary*. There is absolutely no doubt about the stipulation. The Attorney General on brief states: "The parties

stipulated, in lieu of hearing evidence from the numerous representatives [of the charities], that Morrissey made no requests for any benefit from these charities, and no benefit was given to Morrissey in return." The majority avoids this stipulation of fact by saying that the stipulation was a "conclusion" and that "the State Bar did not stipulate the correctness of the witnesses' conclusions." To say, as does the majority, that Morrissey accepted something of value for the purpose of influencing his action as a public official in the face of a stipulation to the contrary places a twist on the record in this case that is unwarranted. I would conclude that Morrissey did not violate DR 8-101(A)(3).

Consequently, I would reverse the judgment of the trial court and remand the proceeding for assessment of an appropriate punishment for the minor violation of DR 1-102(A)(4).