# CIRCUIT COURT OF BUCHANAN COUNTY

Yukon Pocahontas Coal Co.,
Buchanan Coal Co.,
Sayers-Pocahontas Coal Co.

v.

Consolidation Coal Co.

September 18, 2006

Case No. CL04-91

BY JUDGE KEARY R. WILLIAMS

This case is before the Court on Plaintiffs' Motion to Disqualify Defense Counsel. On August 10, 2006, the Court heard oral arguments by counsel, admitted evidence, and took the motion under advisement. The Court has reviewed the pleadings, memoranda, and depositions filed in this case at great length. After examining the evidence along with applicable law and weighing counsels' arguments, the Court grants Plaintiffs' Motion to Disqualify Defense Counsel as to the law firms of McGuireWoods and Altizer, Walk and White and issues the following opinion.

## I. *Factual and Procedural Background*

In addition to the undisputed facts alleged in the court file, the Court finds the following relevant facts supported by depositions submitted to the Court and Plaintiffs' exhibits admitted into evidence at the August 10, 2006, hearing. The Court considered the depositions of Robert Brittain, John Moss, and Steve McAllister upon stipulation by the parties and pursuant to Va. Sup. Ct. R. 4:7(a)(4)(f). All citations are to the copies of the deposition transcripts submitted to the Court at the August 10, 2006, hearing.

### A. *The Parties*

Plaintiffs, Yukon Pocahontas Coal Company (Yukon), Buchanan Coal Company (BCC), and Sayers-Pocahontas Coal Company (Sayers), are Virginia registered limited liability partnerships with principal places of business in Tazewell, Virginia. Charles Dale Harmon, Jr., a resident of Atlanta, Georgia, is the managing partner for the three Plaintiff limited partnerships (collectively referred to as "Big Vein"). Dale Harmon and Charles Hart, a resident of Tazewell, Virginia, are both general partners of Big Vein.

Robert Brittain, a resident of Tazewell, Virginia, is a limited partner of two Big Vein limited partnerships, BCC and Sayers, and also a general partner of Coal Mountain Mining, a partnership neither affiliated with Big Vein nor Consolidation Coal Company, Inc. John Moss, also a resident of Tazewell, Virginia, is a limited partner of BCC and Yukon. Steven McAllister is Treasurer and Vice-President for Finance at Washington and Lee University (W. & L.) located in Lexington, Virginia, and manages W. & L.'s interest as limited partner of BCC. Walter Dudley is Executive Director of Alumni Relations at W. & L. and former law partner at McGuireWoods.

Plaintiffs are represented by Benjamin Street, R. J. Breimann, and S. T. Mullins of the Street Law Firm, located in Grundy, Virginia, and Scott Sexton and Kevin Holt of Gentry, Locke, Rakes & Moore, located in Roanoke, Virginia.

Defendant, Consolidation Coal Co., Inc. (Consol), is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Island Creek Coal Company (Island Creek) is a wholly owned subsidiary of Consol. Gil Gillenwater is a Consol employee.

Defendant is represented by Thomas Spahn, Barbara Ann Williams, Brian Jackson, and Jonathan Blank of McGuireWoods, located in the cities of McLean, Richmond, and Charlottesville, Virginia; James Creekmore and Kari

Munro of the Creekmore Law Firm, located in Daleville, Virginia; and David Altizer of Altizer, Walk and White, located in Tazewell, Virginia.

Big Vein owns approximately 27,000 acres of property located on the Levisa Fork of the Big Sandy River in Buchanan County, Virginia. In 1961, Big Vein and Island Creek entered into a Lease Agreement that authorized Island Creek to mine coal from Big Vein's aforementioned property. The underground passageways, chambers, and voids that formed on the property as a result of Island Creek's mining operations are referred to as the Beatrice Mine. Island Creek has ceased its mining operations in the Beatrice Mine.

Consol operates a coal mine on property adjacent to the Beatrice Mine, referred to as the Buchanan No. 1 Mine. The Buchanan No. 1 Mine is beleaguered with large quantities of surplus water that Consol must remove in order to operate the mine and has applied to the Virginia Department of Mines, Mineral, and Energy (DMME) for a permit that would allow Consol to drain the surplus water out of the Buchanan No. 1 Mine into the Levisa River. In the interim, Island Creek has agreed to allow Consol to temporarily remove the untreated surplus water into the Beatrice Mine.

On May 20, 2004, Plaintiffs filed a Bill of Complaint with this Court alleging that Consol's removal of surplus water from the Buchanan No. 1 Mine into the Beatrice Mine has flooded the Beatrice Mine with toxic water and rendered the remaining minerals in the mine inextricable. Plaintiffs' seek over one hundred and fifty million dollars in damages as well as injunctive relief. Consol responded with a Demurrer to all Counts alleged in Plaintiffs' Bill of Complaint. On September 30, 2004, this Court entered an Order overruling Consol's Demurrer as to all but one of Plaintiffs' Counts.

In January 2005, Plumb Creek Timberlands, L.P., a former plaintiff in this suit, settled with Consol, which enabled Defendant to request a removal to federal court based on diversity of the parties. On January 10, 2005, United States District Court Judge Glen Williams for the Western District of Virginia, Abingdon Division, granted Defendant's request for removal from this Court to federal court. On March 31, 2006, Defendant filed a Motion to Dismiss in federal court that sought to dismiss all Plaintiffs' Counts. In support of its Motion to Dismiss, Defendant alleged that Big Vein lacked standing to file suit against Consol on two grounds: (1) that, in 2004, the Big Vein partnerships ceased to exist and (2) that Dale Harmon lacked authority to act on behalf of Big Vein. In support of its Motion to Dismiss, Defendant argued that, pursuant to the terms of Plaintiffs' Partnership Agreements, which are the same agreements for BCC, Sayers, and Yukon, Plaintiffs' partnerships dissolved on November 1, 2004, and Dale Harmon no longer held his position as managing or general partner after his sixty-ninth birthday in 2003. (Def.'s

78

Renewed Mot. to Dismiss.) On May 11, 2006, the district court remanded this case back to this Court by an Order that preserved all issues not resolved by the federal court. On June 10, 2006, Defendant renewed its Motion to Dismiss in this Court.

On April 3, 2006, Plaintiffs responded to Defendant's Motion to Dismiss and argued that Big Vein's partnerships were not expired and that Dale Harmon had proper authority to act as Big Vein's managing and general partner. (Def.'s Renewed Mot. to Dismiss Ex. 4.) Further, Plaintiffs furnished Defendant with the following documents in support of their opposition to Defendant's Motion to Dismiss: (1) certificates issued by the Virginia State Corporation Commission that documented Plaintiffs' reorganization into Registered Limited Liability Partnerships, effective on February 6, 1998 (Def.'s Renewed Mot. to Dismiss Ex. 4), and (2) Dale Harmon's sworn affidavit, stating that, in 1997, Big Vein passed two amendments to its partnership agreements, one that allowed the partnerships to register as limited liability partnerships and one that extended the partnership termination date from November 1, 2004, to November 1, 2025. (Def.'s Renewed Mot. to Dismiss Ex. 6.) Plaintiffs maintain that the limited partners ratified these proposed amendments to the Big Vein partnership agreements; however, documentation of the ratified amendments could not be located. (Pls.' Mot. to Disqualify at 3, n. 1.) Further, Plaintiffs allege that, before his death, Big Vein's former attorney, Harris Hart, corroborated the ratification of the amendments in a correspondence provided to the Defendant. (Pls.' Mot. to Disqualify at 3, n. 1.)

Defendant argued that Plaintiffs' response to its motion to dismiss failed because Big Vein lacked documentation that confirmed that the proposed amendments had in fact been ratified. (Def.'s Renewed Mot. to Dismiss at 9.) In order to provide documentation of the ratification of the prior amendments to Big Vein partnership agreements and resolve all questions as to Dale Harmon's authority to act as Big Vein's managing partner, Plaintiffs' counsel advised the Big Vein general partners to propose a new amendment to the Big Vein partnership agreements that would "ratify all prior actions taken by past general and managing partners, notwithstanding their age, and … officially document [the] previous amendment increasing the age limit of general and managing partners." (See Pls.' Mot. to Disqualify ¶ 6; Pls.' Ex. 3.) On June 12, 2006, "Plaintiffs' counsel, Scott Sexton … informed defense counsel that plaintiffs were in the process of changing the partnership documentation to eliminate the age issue." (Def.'s Supp. Mem. at 8.) On June 26, 2006, pursuant to Plaintiffs' partnership agreements, Big Vein mailed the proposed amendment to the limited partners for their approval.

Article XIII of Plaintiffs' partnership agreements provide the procedure for the ratification of a proposed amendment by the limited partners:

> the General Partners shall submit to the Limited Partners a verbatim statement of the proposed amendment and, if they deem appropriate, an opinion of counsel as to the legality of such amendment. The General partners shall also include in any such submission their recommendation as to the adoption or rejection of the proposed amendment and a statement to the effect that the recommendation of the General Partners with respect to such proposed amendment shall become effective and the proposed amendment shall be deemed adopted or rejected 30 days after the mailing of such notice unless, prior to such time, Limited partners holding one-third or more of the Limited partnership capital shall object in writing to the General Partners' recommendation.

(Def.'s Renewed Mot. to Dismiss at 4-5.)

B. *Defense Counsel's Communication with the Limited Partners*

The communication at issue occurred primarily between three of Big Vein's limited partners, Robert Brittain, John Moss, and Steve McAllister and defense counsel, David Altizer and McGuireWoods, and is discussed below.

1. *Robert Brittain and David Altizer*

As a limited partner, Robert Brittain (Brittain) is not involved with the details of Big Vein's legal battles. Although Brittain has no expectation that the general partners will inform him of every Big Vein legal decision, he is under the impression that Dale Harmon runs a "one man show" as the managing partner of Big Vein. (Brittain Dep. at 78.) Brittain admits that no general partner has ever accused Dale Harmon of failing to communicate (Brittain Dep. at 56); however, Brittain bases his opinion of Dale Harmon on an allegation made by Gil Gillenwater to Brittain in which Gil Gillenwater claimed that Consol previously made a substantial offer of settlement to Dale

Harmon that was never communicated to Big Vein's general partners,[1] (Brittain Dep. at 43, 57-58), and also on his experience with Dale Harmon in a previous lawsuit where Big Vein and Coal Mountain Mining were plaintiffs. Although Brittain was of the opinion that Dale Harmon was not communicating with Coal Mountain Mining in that suit, he admitted that Coal Mountain Mining's managing partner never implicated that Dale Harmon failed to communicate and that he was satisfied with the outcome of that suit. (Brittain Dep. at 58-59.)

Further, Brittain is apprehensive of the possibility that a separate lawsuit instituted by Big Vein against the DMME will negatively affect the pending application that Consol has with the DMME and possibly force Consol to pull its mining operation out of Buchanan County. (Brittain Dep. at 13, 20-23, 68, 71, 76-77, 81.) The negative impact that Big Vein's lawsuit against the DMME may have on Consol's DMME permit application is unclear from the record; however, Brittain is "pretty much of the mind that Consol ... [is] getting fed up with having to worry about litigation every time [it] deal[s] with Dale Harmon and that ... he ha[s] to worry that [Consol is] not going to mine the Big Vein coal and ... mine other coal or just ... quit mining in Buchanan County." (Moss Dep. at 27.) After learning that Big Vein filed a lawsuit against the DMME, Brittain was frustrated at the thought that Dale Harmon had once again initiated a lawsuit that he believed would further deteriorate relations between Big Vein and Consol and drive Consol out of Buchanan County. (Brittain Dep. at 13, 56, 68, 76.) Concerned that his own mining endeavors would suffer should Consol pull its mining operations out of Buchanan County,[2] Brittain went to see Gil Gillenwater at Consol. (Brittain Dep. at 13, 22, 71, 76-77, 81.) According to the Court file, Big Vein filed suit against the DMME on June 13, 2006. Some time after meeting with Brittain, Gil Gillenwater telephoned Brittain and arranged for Brittain to meet with David Altizer. (Brittain Dep. at 14.)

---

[1] Brittain does not know which case Gil Gillenwater referenced when he claimed that Consol offered to settle with Big Vein, the litigation at bar or previous litigation between Big Vein and Consol (Brittain Dep. at 43); however, Defendant asserts that Gil Gillenwater made an offer "to settle all litigation and claims with the Big Vein partnerships," including the case at bar, in September 2004. (Def.'s Supp. Mem. at 10.)

[2] At Coal Mountain Mining meetings, the Coal Mountain Mining general partners discussed the effects of Consol pulling out of Buchanan County on their own coal mining interests. (Brittain Dep. at 67.)

Essentially, two meetings transpired between Brittain and Altizer. Brittain was aware that Altizer was Consol's attorney from certain meetings of the Coal Mountain Mining general partners that Altizer and other representatives of Consol attended. (Brittain Dep. at 12.) Consol's exact purpose at those meetings is unclear from the record. The first meeting occurred sometime in late June or early July 2006, when Brittain and his son, Bucky Brittain, briefly met with Altizer, Gil Gillenwater, and Brian Jackson at Altizers's office in Tazewell, Virginia. (Brittain Dep. at 14-15, 18-19, 24.) Bucky Brittain is an attorney. (Brittain Dep. at 62.) At this meeting, Brittain voiced his discontent with Big Vein's management[3] and discussed possible ways that he and Altizer could "gather the limited partners and vote down" the Big Vein proposed amendment in order to replace Big Vein's management with younger general partners. (Brittain Dep. at 16-19, 25, 36-37.) At that time, the Big Vein limited partners had not received notice of the amendment; however, Brittain was aware of the proposed amendment as a result of an earlier discussion with Charlie Hart. (Brittain Dep. at 16.) Notice of the Big Vein proposed amendment was sent to the limited partners around June 26, 2006. (Moss Dep. at 7-8.) Further, Brittain did not inform Altizer of the proposed amendment; Altizer was already aware of the proposed Amendment. (Brittain Dep. at 21; Def.'s Supp. Mem. at 8.)

Also at this first meeting, Brittain entered into "A Common and Mutual Interest Agreement" (Agreement) with Consol (Brittain Dep. at 63, 69)[4] where Brittain agreed to accept Altizer's "assistance … in preventing the … amendment to the Operating Agreements of the individual Plaintiffs." (Agreement at 2.) In the Agreement, Brittain agreed to contact the Big Vein limited partners and encourage them to object to the proposed amendment (Brittain Dep. at 26)[5] in exchange for Consol's promises to pay Brittain's attorney's fees associated with the Agreement (Brittain Dep. at 69, 73) and to indemnify and hold Brittain harmless should any action against him result from the Agreement. (Brittain Dep. at 73.) The parties to the Agreement were

---

[3] Brittain was under the belief that a different managing partner would better inform the general partners of matters related to pending litigation. (Brittain Dep. at 26.)

[4] Brittain never read the written version of the agreement. (Brittain Dep. at 73.)

[5] Brittain was a limited partner of BCC and Sayers; thus, the Agreement required Brittain to recruit a Yukon limited partner in order to contact all Big Vein limited partners. (Brittain Dep. at 29.)

Consol Energy, Inc., Consol (referred to as "CCC" in the Agreement), Brian Jackson, Altizer, John Lichtenstein, Brittain, and John Moss. (Agreement at 4, 15-16, 20.) The Agreement also required[6] the free exchange of information between the Parties that would benefit the "common interest group." (Agreement at 3.) The Agreement defined "common interest group" as "all officers, directors, employees, representatives, consultants, experts, attorneys, or agents of CONSOL and CCC and Robert B. Brittain ... and John L. Moss, as well as their heirs, representatives, and agents." (Agreement at 4.) Further, Altizer advised Brittain to hire separate counsel and referred him to John Lichtenstein of Lichtenstein, Fishwick and Johnson in Roanoke, Virginia. (Brittain Dep. at 49.) Brittain retained John Lichtenstein as counsel shortly after that meeting. (Brittain Dep. at 51.)

A few days later, Brittain, along with John Lichtenstein and Bill Jackson,[7] met with Altizer, Gil Gillenwater, Jonathan Blank, and Brian Jackson at Altizer's office. (Brittain Dep. at 31-32.) At this meeting, Brittain presented Altizer with a handwritten letter that encouraged other limited partners to object to the proposed amendment and a list of the BCC and Sayers limited partners' names and addresses. (Brittain Dep. at 7-9, 26, 33.) Further, Bill Jackson furnished Altizer with a list of names and addresses of the Yukon limited partners. (Brittain Dep. at 32.) Altizer later returned a revised letter to Brittain for his signature. (Brittain Dep. at 32-34.) On July 3, 2006, Altizers' office enclosed a prepaid-postage envelope that allowed the limited partners to return objections and mailed the revised letter to the BCC and Sayers limited partners. (Brittain Dep. at 8, 47, 56; Pls.' Ex. 4.)

During the communication between Brittain and defense counsel, Altizer, nor any other Consol representative, informed Brittain of Consol's pending motion to dismiss in the litigation between Big Vein and Consol. (Brittain Dep. at 26-27, 60, 65.) The ratification of this amendment would annihilate the grounds relied on by Consol for its motion to dismiss. Brittain perceived that he and Consol had a mutual interest in Consol continuing to mine in Buchanan County and that removing Dale Harmon as Big Vein's

---

[6] John Moss, an attorney, interpreted the twenty-page "detailed" Agreement as not only allowing the free exchange of information between the Parties, but requiring the exchange of information "that would be helpful to the common interest group." (Moss Dep. at 34.)

[7] Brittain brought Bill Jackson to the meeting as a Yukon limited partner; however, Brittain was unaware at the time that Bill Jackson previously transferred his Big Vein interest to his children and was no longer a limited partner of Yukon. (Brittain Dep. at 31, 51-52.)

managing partner would further that goal by facilitating negotiations between Big Vein and Consol. (Brittain Dep. at 22-23, 26, 37-38, 40, 61, 64, 79.) In addition to believing that Consol previously made an offer of settlement to Big Vein that Dale Harmon never communicated to the general partners, Brittain was under the impression that Dale Harmon preferred to sue rather than discuss issues. (Brittain Dep. at 42-43, 56.) Brittain had no idea that the removal of Dale Harmon as managing partner would possibly result in the dismissal of the Big Vein lawsuit against Consol and never intended to harm Big Vein's position in the litigation with Consol. (Brittain Dep. at 27, 37.) In Brittain's own words, Brittain would be "a fool to" negatively affect the outcome of the litigation between Big Vein and Consol in light of the number of BCC shares held by his family. (Brittain Dep. at 61.) Consequently, had Brittain known that his objection to the proposed amendment would potentially harm Big Vein's lawsuit against Consol, he would not have entered into the Agreement with Consol to defeat Big Vein's proposed amendment. (Brittain Dep. at 27, 61.)

## 2. *John Moss and David Altizer*

John Moss first became aware of the Big Vein proposed amendment in May or early June 2006, when he and Brittain casually met on the street in Tazewell. (Moss Dep. at 7.) In an effort to persuade Moss to join his effort to defeat the proposed amendment, Brittain initiated a conversation with Moss concerning the Big Vein general partners and advocated for an age limit of sixty-nine. (Moss Dep. at 7-10.) Moss was a Yukon member and Brittain needed a Yukon limited partner to sign the letter opposing the proposed amendment. (Brittain Dep. at 29.) At this time, Moss was neutral on the issue of the general partner age limit. (Moss Dep. at 9.) In the following weeks, Moss met Brittain a second time on the street and, in an attempt to advance his position opposing the proposed amendment, Brittain explained his perception of the communication problems between Big Vein's management and general partners to Moss. (Moss Dep. at 11-12, 14, 17-18.) Brittain informed Moss of the alleged Consol settlement offer, *see* discussion *supra* Part I.B.1, and gave Moss the impression that Consol made a sizable offer of settlement to Dale Harmon in a previous suit between Big Vein and Consol that ended unfavorably with no recovery for Big Vein. (Moss Dep. at 11.) The two limited partners also discussed the possibility of Consol pulling its mining operations out of Buchanan County as a result of the Big Vein lawsuit against the DMME. (Moss Dep. at 27.) During a third meeting between Moss and Brittain, Brittain and his son, Bucky, dropped by Moss' office in Tazewell to alert Moss of the fact that Big Vein filed a lawsuit

against the DMME, and Brittain successfully signed Moss on as a Yukon limited partner to his and Consol's crusade to defeat Big Vein's proposed amendment. (Moss Dep. at 15-19.) Brittain then arranged for Moss to meet with Altizer. (Moss Dep. at 19, 22.)

Shortly thereafter, Moss and Brittain met with Altizer at Altizer's office in Tazewell. (Moss Dep. at 23.) At this meeting, the three men briefly discussed the letter to the Yukon limited partners that Altizer was revising[8] and the Agreement, which was in the process of being drafted. (Moss Dep. at 26, 32, 36-37.) This is the same Agreement entered into by Brittain with Consol, *see* discussion *supra* Part I.B.1, where Consol agreed to pay Moss' legal fees, to indemnify him and hold him harmless for any action that arose in connection with his efforts to defeat the amendment, and required the free exchange of information that would benefit the "common interest group." (Moss Dep. at 32-34.) Also at this meeting, Altizer advised Moss to retain John Lichtenstein as separate counsel. (Moss Dep. at 38.) Lichtenstein telephoned Moss later that day, and Moss agreed to the representation. (Moss Dep. at 39.) Later that afternoon, Altizer's secretary delivered the finalized letter and Agreement to Moss at his office for his review. (Moss Dep. at 25, 32-33.) Moss signed and returned the documents to Altizer's secretary. (Moss Dep. at 25.) On July 7, 2006, Altizer's firm mailed Moss' letter, along with an enclosed prepaid-postage envelope for the return of objections, to the Yukon limited partners. (Moss Dep. at 51; Pls.' Ex. 4.)

At the time Moss agreed to join the campaign to defeat the Big Vein proposed amendment, Moss was unaware that Big Vein and Consol were involved in litigation over the Beatrice Mine. (Moss Dep. at 11, 15, 19, 26-30, 49.) Moss first learned of Big Vein's lawsuit against Consol in a letter that he received from Dale Harmon, which informed the Big Vein limited partners of the Consol suit and explained the general partners' purpose for proposing the amendment to the Big Vein partnership agreements. (Moss Dep. at 29-30.) Moss does not state the date that he received Dale Harmon's letter; however, it was after Moss' communication with Altizer. (Moss Dep. at 29.) Oblivious of the pending litigation, Moss "certainly didn't know that [Dale Harmon's] age" was an issue in the case. (Moss Dep. at 30.) Further, Moss never intended "to torpedo" any Big Vein pending lawsuit. (Moss Dep. at 30.) Consequently, Moss felt misled by Altizer's omission of the pending litigation and motion to dismiss. (Moss. Dep. at 49.)

---

[8] The letter Altizer mailed to the Yukon limited partners on behalf of Moss is nearly identical to the letter sent to BCC and Sayers on behalf of Brittain. (Pls.' Ex. 4.)

### 3. *Steve McAllister and McGuireWoods*

On July 13, 2006, shortly after receiving notice of the Big Vein proposed amendment, Steve McAllister received an e-mail from Walter Dudley informing him of a Big Vein "partnership dispute." (McAllister Dep. at 7.) With the exception of Brittain's and Moss' objections to the proposed amendment, there was no prior division among the limited partners over the issue of Dale Harmon's authority to act as managing partner of Big Vein. (Brittain Dep. at 28; Pls.' Supp. Mem. at 10.) In the e-mail, Walter Dudley professed that two of his former law partners at McGuireWoods gave him the "heads up" on the "partnership dispute" where the Big Vein members were "very much at odds ... over whether the current general partner should stay in that role" and advised that "whoever" handled W. & L.'s interest in Big Vein to contact John Lichtenstein in order "to get current" so that W. & L. could "act appropriately." (McAllister Dep. at 9-10, Ex. 1.) Thereafter, McAllister telephoned John Lichtenstein, who encouraged McAllister to object to the amendment. (McAllister Dep. at 10-11.) Finding Lichtenstein's reasoning meritless, McAllister chose not to object to the proposed amendment. (McAllister Dep. at 12.)

### C. *Communication between the Attorneys*

On June 15, 2006, Altizer informed Benjamin Street of his intentions to join Consol's defense. (Pls.' Supp. Mem. at 4.) Defendant's Memorandum of Law in Support of Its Motion to Dismiss for Lack of Standing and Mootness Pursuant to Rules 12(b)(1) and 12(h)(3), filed in the United States District Court for the Western District of Virginia on March 31, 2006, listed J. Brian Jackson and Jonathan T. Blank of McGuireWoods, L.L.P., and James R. Creekmore of the Creekmore Law Firm as defense counsel of record; however, David Altizer was not listed.During his conversation with Altizer, Street became concerned that Altizer would contact and communicate with the Big Vein limited partners on the issue of Dale Harmon's authority to act as Big Vein's managing partner. (Pls.' Supp. Mem. at 4.) On June 23, 2006, Street addressed these concerns in a letter to Altizer and cautioned against *ex parte* communications with "any membership of Big Vein." (Pls.' Ex. 3.) On June 26, 2006, Altizer responded to Street with a letter informing Street that Altizer has "known many of the members of Big Vein for decades and count a number of them as [his] clients." (Pls.'s Ex. 2 at 2.) Further, Altizer assured Street that he would only communicate with the Big Vein members on a social

basis; however, he would advise his clients "who happen to have membership in Big Vein" of the impact of the Big Vein litigation with Consol on his clients' "non-Big Vein interests." (Pls.' Ex. 2 at 2.)

On or about July 11, 2006, after receiving objections to the Big Vein proposed amendment from the limited partners, Plaintiffs' counsel telephoned Altizer and inquired as to whether Altizer had in fact communicated with the Big Vein limited partners concerning the proposed amendment. (Pls.' Mot. to Disqualify ¶ 13.) Plaintiffs allege that Altizer admitted to Plaintiffs' counsel that he had discussed the litigation with Brittain and advised Brittain of the affect of the litigation on Brittain's non-Big Vein interests. (Pls.' Mot. to Disqualify at ¶ 13.)

On July 19, 2006, Plaintiffs filed this Motion to Disqualify Defense Counsel and moved to disqualify the law firms of McGuireWoods; Altizer, Walk and White; and the Creekmore Law Firm[9] as counsel for Consol and for a protective order enjoining these law firms from communicating with new defense counsel as to the substance or content of *ex parte* communication between defense counsel and the Big Vein limited partners. Plaintiffs' Motion to Disqualify Defense Counsel is now before the Court.

## II. *Analysis*

### A. *Motion to Disqualify Standard*

A motion to disqualify requires the Court to weigh "the right of a party to retain counsel of his choice and the substantial hardship which might result from disqualification ... against the public perception of and the public trust in the judicial system." *Stokes v. Firestone*, 156 B.R. 181, 185 (Bankr. E.D. Va. 1993) (citations omitted). Although "[t]here must be a balance between the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community ... the right of one to retain counsel of his choosing is secondary in importance to the Court's duty to maintain the highest ethical standards of professional conduct to insure and preserve trust in the integrity of the bar." *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 729 (D. Va. 1990). The Court must

---

[9] Due to Defendant's representation that the Creekmore Law Firm did not participate in the *ex parte* communication with the Big Vein limited partners, Plaintiffs withdrew its Motion to Disqualify Defense Counsel as to the Creekmore Law Firm. (Hr'g. Aug. 10, 2006.)

therefore resolve all doubts in favor of disqualification. *Rogers v. Pittston Co.*, 800 F. Supp. 350, 353 (W.D. Va. 1992), *aff'd mem.*, 996 F.2d 1212 (4th Cir. 1993) (citation omitted).

Because, "[t]he guiding principle in considering motions to disqualify counsel is safeguarding the integrity of the court proceedings; [and] the purpose of granting such motions is to eliminate the threat that the litigation will be tainted," *Stokes*, 156 B.R. at 185, a motion to disqualify is decided by a two-prong analysis. *See Dulles Corner Props. II, L.P. v. Smith*, 38 Va. Cir. 507, 513 (1992) (adopting "the Second Circuit's standard for weighing the competing interests in Motions for Disqualification"). First, the moving party must show a clear ethical violation by opposing counsel. *See Gay v. Luihn Food Sys., Inc.*, 54 Va. Cir. 468, 470 (2001); *McDonough v. Alpha Constr. & Eng'g Corp.*, 27 Va. Cir. 50, 52 (1991). Second, the moving party must establish that the case at bar is tainted as a result of opposing counsel's unethical conduct. *See Dulles*, 38 Va. Cir. at 513.

Further, due to the factually-dependent nature of a motion to disqualify, "[d]isqualification issues must be decided on a case-by-case basis," *Rogers*, 800 F. Supp. at 353 (citation omitted), and a trial court is "allowed substantial latitude to evaluate in the light of their informed judgment the facts and circumstances of each case." *Wheat v. United States*, 486 U.S. 153, 163-164 (1988). However, the potential for an abusive filing of a motion to disqualify for a "purely strategic" purpose warrants the strictest of scrutiny by the Court. *Tessier*, 731 F. Supp. at 729 (citations and internal quotation marks omitted); *see Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) (citation omitted). Thus, a court should grant a motion to disqualify only in cases where the moving party has met "a high standard of proof to show that disqualification is warranted." *Tessier*, 731 F. Supp. at 729 (citations and internal quotation marks omitted).

## B. *Ethical Violation*

Absent Virginia precedent, the Court will look to the federal courts and other Virginia circuits for guidance. The Court recognizes that, although a federal court "utilizes the Code of Professional Responsibility as adopted by the Supreme Court of Virginia," a federal court "must … look to federal law in order to interpret and apply those rules and [does] not abdicate to the state's view of what constitutes professional conduct even in diversity cases." *Lewis v. CSX Transp., Inc.*, 202 F.R.D. 464, 466 (W.D. Va. 2001) (citing *Armsey v. Medshares Mgmt. Servs., Inc.*, 184 F.R.D. 569, 573 (W.D. Va. 1998) (citations omitted)). Thus, this Court may look to federal courts for the basic

framework and underlying principles of a motion to disqualify analysis; however, it must look to Virginia state court opinions when interpreting Virginia's code of ethics.

Further, Virginia State Bar Legal Ethics Opinions (LEOs), issued by the Virginia State Bar Standing Committee on Ethics (Committee), although not binding on this Court and advisory only, "are instructive and assist the Court in construing the meaning of the Disciplinary Rules and Ethical Considerations contained in the Virginia Code of Professional [Conduct]." *Appleton v. Bondurant & Appleton, P.C.*, 67 Va. Cir. 95, 104 (2005) (citation and internal quotation marks omitted).

Plaintiffs allege that "[c]ounsel for the defendant has violated applicable rules of ethical conduct by communicating directly, and indirectly, with an opposing party, outside the presence of its attorneys." (Pls.' Mot. to Disqualify, ¶ 19.) Virginia Supreme Court Rule Part 6, Section II, contains Virginia's ethical code, the Virginia Rules of Professional Conduct, which replaced the Virginia Code of Professional Responsibility on January 1, 2000. Va. Sup. Ct. R. Pt. 6, Sec. II (2006). Specifically, Plaintiffs allege that defense counsel violated Virginia Rules of Professional Conduct 4.2, 4.3,[10] 1.7,[11] and 8.4(c).

*1. Virginia Rules of Professional Conduct 4.2: Communication with Persons Represented by Counsel*

Rule 4.2 prohibits *ex parte* communication with a represented person by opposing counsel.

---

[10] Rule 4.3 governs an attorney's communication with unrepresented persons. Because the Court finds that the limited partners were represented by Plaintiffs' counsel in the litigation, Rule 4.3 is not applicable to the circumstances at bar. However, had Plaintiffs' counsel not represented the Big Vein limited partners in the litigation, defense counsel violated Rule 4.3 by giving advice other than to retain separate counsel to the limited partners and engaging in overreaching and misrepresentation through drafting the letters and the Agreement and sending the e-mail to McAllister.

[11] Because defense counsel does not presently represent Brittain, Moss, or McAllister, nor have they represented them in the past, the Court finds that Rule 1.7, which governs conflicts of interest, is inapplicable to the case at bar. (Def.'s Supp. Mem. at 11.)

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Va. R. Prof. Conduct 4.2. The Comments to Rule 4.2[12] provide the Court with insight to the Rule's applicability and rationale.

■ In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons in the organization's "control group" as defined in *Upjohn v. United States*, 449 U.S. 383 (1981), or persons who may be regarded as the "alter ego" of the organization. The "control group" test prohibits *ex parte* communications with any employee of an organization who, because of their status or position, have the authority to bind the corporation. Such employees may only be contacted with the consent of the organization's counsel, through formal discovery or as authorized by law. An officer or director of an organization is likely a member of that organization's "control group." The prohibition does not apply to former employees or agents of the organization, and an attorney may communicate *ex parte* with such former employee or agent even if he or she was a member of the organization's "control group." If an agent or employee of the organization is represented in the matter by separate counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.
■ This Rule covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question. … [T]he need to protect uncounselled persons against being taken advantage of by opposing counsel … is [not] limited to those circumstances where the represented person is a party to an adjudicative or other formal proceeding.

---

[12] Due to recent changes to the Rule 4.2 Comments, prior Comment 4 is now Comment 7. *See* Va. R. Prof. Conduct 4.2 cmts. (LEXIS through March 1, 2006).

■ Concerns regarding the need to protect uncounselled persons against the wiles of opposing counsel … are equally applicable in a non-adjudicatory context, such as a … contract.

Va. R. Prof. Conduct 4.2, cmts. 7-9. Further, interpreting Rule 4.2 in the organizational context,[13] the Committee advised that *ex parte* communication by an attorney with an agent of an adverse organizational party who has not retained separate counsel without the consent of the attorney for the organization is proper where (1) the agent is not part of the corporate "control group" or considered the corporation's "alter ego" and (2) the attorney discloses "his adversarial role to the employee." Va. Leg. Ethics Op. 905 (1987). *See* Va. Leg. Ethics Ops. 347, 459, 530, 533, 795, 801, 1076, 1190, 1281, 1504, 1527, 1537, 1670, 1749.

Thus, *ex parte* communication with an agent of an adverse represented organization is allowed only in the following instances: (1) the agent is not in the organization's "control group" or cannot be regarded as the organization's "alter ego" and the attorney discloses his adverse role in the litigation; (2) the communication is with a former agent of the organization; (3) the organization's attorney consents to the communication; (4) separate counsel, independently retained by the agent in the matter, consents to the communication; (5) the communication does not involve the subject of the representation; or (6) the communication is authorized by law.

Because Big Vein is represented by counsel who did not consent to defense counsel communicating with the Big Vein limited partners on the subject of Dale Harmon's authority to act as Big Vein's managing partner (Pls. Ex. 3), the first issue before the Court is whether the Big Vein limited partners are members of Big Vein's "control group" or are considered Big Vein's "alter ego."

---

[13] Prior to 2000, the applicable Virginia Ethical Rule was DR 7-103(A)(1), which the Committee explained is "substantially the same . . . except for the change of `party' to `person' to emphasize that the prohibition on certain communications with a represented person applies outside the litigation context." Va. R. Prof. Conduct 4.2 (Va. Code Comparison). Further, "[t]he Committee believed that substituting `person' for `party' more accurately reflected the intent of the Rule . . . and was preferable to the apparent limitation of DR 7-103(A)(1) which referred to `[c]ommunicat[ion] on the subject of the representation with a party'." Va. R. Prof. Conduct 4.2 (Comm. Commentary). The Committee, however, "recognize[d] that a different opinion might result if the facts . . . were analyzed under Rule 4.2 of the Model Rules which adopt[ed] a broader prohibition of *ex parte* contacts than DR 7-103(A)(1)." Va. Leg. Ethics Op. 1670 (1996).

### (a) *Control Group*

Rule 4.2 prohibits *ex parte* communication with any member of an organization's "control group," as defined by *Upjohn v. United States*, 449 U.S. 383 (1981). Va. R. Prof. Conduct 4.2, cmt. 7. *Upjohn* defined a member of an organization's "control group" as an employee or agent of the organization that "could commit the [organization] to specific courses of action" or "bind the [organization] by their acts or admissions." Va. Leg. Ethics Op. 801 (1986); *Pruett v. Virginia Health Services, Inc.*, 69 Va. Cir. 80, 82 (2005). Comment 7 reiterates this definition of "control group" and further explains that "[a]n officer or director of an organization is likely a member of that organization's `control group'." Va. R. Prof. Conduct 4.2, cmt. 7. Also, the Committee opined that a member of the "control group" is defined as an agent who has "authority to act on behalf of the corporation." Va. Leg. Ethics Op. 905. By definition, a limited partner cannot bind or act on behalf of Big Vein; therefore, the limited partners in this case are not members of Big Vein's control group. Under Big Vein's partnership agreements, the limited partners do not possess the power to bind the partnerships. (Def.'s Mem. at 12.) Further, Virginia Code § 50-73.24(6)(e)-(f) "defines `control of the business' of a limited partnership to exclude [p]roposing, approving, or disapproving, by voting or otherwise … [t]he admission or removal of a general partner … [a]n amendment to the partnership agreement or certificate of limited partnership."

### (b) *Alter Ego*

An agent is considered an organization's "alter ego" if that agent has the capacity to "make decisions on behalf of the [organization] in the particular area which is the subject matter of the litigation." Va. Leg. Ethics Op. 905. Further, an organization's agent is considered the "alter ego" when the agent is in "a position to commit the … [organization] in the particular situation because of his authority as a corporate officer or because for some other reason the law cloaks him with authority." Va. Leg. Ethics Op. 459 (1982) (citing ABA Informal Ethics Op. 1377 (1977)). Deciding the issue of whether it was proper for the plaintiff's counsel to engage in *ex parte* communication with employees of a defendant nursing home on the issues in an underlying medical malpractice case, the Circuit Court of Lancaster County interpreted *Upjohn* and concluded that only the nursing home's managerial employees were members of the control group. *Pruett*, 69 Va. Cir. at 84. The

court then looked to an "alter ego" analysis to decide whether it was ethical for opposing counsel to communicate *ex parte* with the floor nurses, CNAs, and other direct care providers who were familiar with the plaintiff's decedent's care but not considered members of the nursing home's control group. *Id.* at 80.

In *Pruett,* the court defined "alter ego" under Rule 4.2 as "[s]uch persons ... who act on behalf of the corporation performing the work to which they are assigned" and explained that an employee was considered the "alter ego" of a corporation where through "hands on interaction ... [the employee allowed] the corporation [to] carry out its purposes." 69 Va. Cir. at 85. Because the nursing home employees who provided resident care were necessary to carry out the purpose of the nursing home, the court considered those employees the "alter ego" of the nursing home. *Id.* Reasoning that *ex parte* contact with these employees created the "potential for disrupting the current operation of the defendant's facility," the court found that "a more controlled process of discovery under the rules of court would better serve the administration of justice in th[at] case." *Id.* Thus, the court prohibited the plaintiff's attorney from contacting the defendant's employees who provided resident care, whether they were in the nursing home's control group or not, on any matters related to the underlying issues in the malpractice suit. *Id.* Likewise, the Big Vein limited partners are considered Big Vein's "alter ego" for purposes of communication concerning the amendment ratification process. By virtue of the authority granted to them by Big Vein's partnership agreements, the Big Vein limited partners "make decisions on behalf of the [organization] in the particular area which is the subject matter of the litigation." Va. Leg. Ethics Op. 905.

First, the Big Vein proposed amendment is a subject matter in the underlying litigation. The Supreme Court of Virginia defines "the subject matter involved in [a] pending action" as relating to the "claim or defense of [any] party" to the litigation. Va. Sup. Ct. R. 4:1. Because the subject of the proposed amendment is identical to the grounds of Defendant's Motion to Dismiss, i.e., the authority of Dale Harmon to act on behalf of Big Vein, and Plaintiffs proposed the amendment as a defense to Defendant's Motion to Dismiss, the proposed amendment is a matter in the litigation. (*See* Moss Dep. at 29-31.) Second, pursuant to Plaintiffs' partnership agreements, the Big Vein limited partners possess the sole power to ratify an amendment proposed by the general partners. (Article XIII of Plaintiffs' partnership agreements, *supra* n. 4.) Thus, because the Big Vein limited partners have the authority to decide whether Dale Harmon may act on behalf of Big Vein and Dale Harmon's authority to act on Big Vein's behalf is a subject matter in the litigation, the

Big Vein limited partners make decisions on behalf of Big Vein in the particular area which is a subject in the underlying litigation, and as such, are considered Big Vein's "alter ego" for the purpose of the amendment ratification purpose.

Further, Defendant's *ex parte* contact with the Big Vein limited partners interfered with the amendment ratification process and disrupted the current operation of the limited partnerships. Although the Big Vein limited partners do not have a "hands on" role in the purpose of the organization, i.e., mining coal, the limited partners have a "hands on" role in ratifying the amendment, which determines whether Big Vein carries on its operation. Further, defense counsel's *ex parte* contact with the limited partners disrupted Big Vein's process of amendment ratification and justice would be better served in this case by defense counsel communicating with the Big Vein limited partners through methods proscribed by formal discovery. *Pruett*, 69 Va. Cir. at 85. *See* Moss Dep. at 49-49, 52. Thus, the administration of justice mandates that the attorneys representing Big Vein's interest in this case receive notice prior to any contact by defense counsel with Plaintiffs' limited partners concerning the ratification of the amendment. *See* Va. R. Prof. Conduct, pmbl. ("[t]he Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself.").

Moreover, the rationale behind Rule 4.2 is applicable to this case. The Comments to Rule 4.2 explain that the Committee adopted Rule 4.2 to protect "uncounselled persons against being taken advantage of by opposing counsel." Va. R. Prof. Conduct 4.2, cmt. 8. Although the limited partners are not able to bind the limited partnerships under Big Vein's partnership agreements, the limited partners nonetheless possess information and control over a matter in the litigation to the extent that they jeopardized Plaintiffs' position in the litigation when they communicated with defense counsel without the benefit of Plaintiffs' counsel's advice. It is situations such as this that Rule 4.2 seeks to prevent by "protecting uncounselled persons against the wiles of opposing counsel." Va. R. Prof. Conduct 4.2, cmt 9. Had Plaintiffs' attorneys consented to defense counsel communicating with the Big Vein limited partners on the issue of the proposed amendment, Plaintiffs' attorneys would have first advised the limited partners of the details of the pending motion to dismiss and afforded the limited partners the opportunity to make an informed decision as to whether objecting to the proposed amendment was in their best interest. *See Upjohn*, 449 U.S. at 392 (holding that an organization's "attorney's advice will ... frequently be more significant to noncontrol group

members than to those who officially sanction the advice"); Va. Leg. Ethics Op. No. 1553 (1993) (opining that "Rule 4.2 prohibits *ex parte* contacts with `persons' rather than `parties' ").

Because the limited partners[14] are considered Big Vein's "alter ego" for the purpose of the ratification of the proposed amendment and defense counsel communicated with the limited partners on the subject of the proposed amendment's ratification without Plaintiffs' attorney's consent (Pls.' Ex. 3), the next issue for the Court to resolve is whether separate counsel represented the limited partners during the communication with defense counsel, and, if so, whether the limited partners' separate counsel consented to defense counsel's *ex parte* contact.

### (c) *The Limited Partners' Separate Counsel*

Defendant argues that counsel separate from Big Vein's attorneys represented Brittain, Moss, and McAllister at the time defense counsel communicated with the limited partners, thus, *ex parte* contact with the limited partners is not prohibited by Rule 4.2, even if the limited partners are considered part of Big Vein's "control group" or "alter ego." (Hr'g Aug. 10, 2006.) The Court disagrees. First, Rule 4.2 prohibits *ex parte* communication by opposing counsel "with a person the lawyer knows to be represented by another lawyer in the matter." Va. R. Prof. Conduct 4.2. Here, defense counsel communicated with the limited partners prior to Brittain and Moss obtaining separate counsel in the matter. Second, even if the limited partners were separately represented in the matter at all times, separate counsel did not consent to the communication prior to defense counsel communicating with the limited partners.

First, Brittain and Moss were not represented by separate counsel "in the matter." Va. R. Prof. Conduct 4.2. "The matter" in the case at bar is not only the authority of Dale Harmon to act as managing and general partner of Big Vein, but whether Dale Harmon has the authority to act on behalf of Big Vein in the suit against Consol. It was not until after defense counsel contacted the limited partners that Consol agreed to pay their attorney's fees and defense counsel's referral, that Brittain and Moss retained John Lichtenstein. (Brittain Dep. at 23-24; Moss Dep. at 25.) Considering the pending litigation between Big Vein and Consol, the fact that Consol not only

---

[14] By drafting, financing, and mailing the letters to the Big Vein limited partners, defense counsel contacted all of Big Vein's limited partners. (Moss Dep. at 26, 32, 36; Pls.' Ex. 4.)

referred Brittain and Moss to John Lichtenstein, but also paid for his services under the Agreement, raises the ethical question of Consol's "interference with the independence of [John Lichtenstein's] professional judgment" under Va. R. Prof. Conduct 1.8 (f)(2). The Court finds Defendant's argument that Brittain was represented by his son, Bucky, and that Moss represented himself during their communication with defense counsel unpersuasive. The record is void of facts that suggest that Bucky or Moss attended the meetings with Altizer in their capacity as attorneys or that Bucky represented Brittain in the litigation with Consol. Rather, the record suggests that Bucky accompanied his father in his capacity as Brittain's son. (Brittain Dep. at 23.) As Moss testified in his deposition, Brittain's relationship with his son Bucky is "like two best friends riding around in a truck basically." (Moss at 21.) Further, the fact that Moss was unaware of the pending litigation with Consol leads the Court to conclude that Moss was incapable of representing himself in the matter. (Moss Dep. at 11, 15, 19, 26-30, 49.) Thus, defense counsel violated Rule 4.2 when it communicated with Brittain and Moss before they were represented by John Lichtenstein about the subject of the pending motion to dismiss without Plaintiffs' attorneys' consent.

Second, even if Brittain and Moss were represented by separate counsel at the time defense counsel communicated with them, the communication was improper because defense counsel failed to obtain prior consent from separate counsel before communicating with the limited partners. Rule 4.2 "requires consent of opposing counsel, not merely his presence." Va. Leg. Ethics Op. 1752 (2001). Construing Rule 4.2, the Committee reasoned that "a `surprise' contact would not afford the opposing counsel the opportunity to decline the communication, but only to comment upon it afterward." Va. Leg. Ethics Op. 1752. Further, defense counsel's contact with McAllister also lacked separate counsel's pre-contact consent. Although McAllister was represented by W. & L.'s in-house attorney, Leanne Shank (McAllister Dep. at 19), McAllister and Shank were contacted via the same e-mail, transmitted at the same time. (McAllister Dep. Ex. 1.) Because Rule 4.2 requires advance consent before an attorney may communicate with a party even in the presence of his lawyer, Defendant's argument fails. Thus, defense counsel violated Rule 4.2 when it communicated with the Big Vein limited partners concerning the amendment ratification without pre-contact consent from either counsel for the Plaintiffs or separate counsel independently retained by the limited partners in the matter. Further, even should the limited partners not be considered Big Vein's "alter ego," defense counsel's *ex parte* communication violated Rule 4.2 due to defense counsel's failure to disclose its "adversarial role in the litigation." Va. Leg. Ethics Op. 530 (1983); *see* discussion *infra* Part II.B.2.

### 2. *Virginia Rules of Professional Conduct Rule 8.4: Misconduct*

Plaintiffs allege that by communicating with the Big Vein limited partners *ex parte*, defense counsel violated Rule 8.4(c), which states, "[i]t is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation which reflects adversely on the lawyer's fitness to practice law." Va. R. Prof. Conduct 8.4(c). Further, Rule 8.4(c) applies to this case because "[a]n attorney's duty not to practice deceit or misrepresentation is not confined to dealings with his clients; it also extends to others who may be adversely affected by such conduct." *Morrissey v. Virginia State Bar*, 248 Va. 334, 340-41 (1994) (citation omitted).

By concealing its adversarial role in the litigation and failing to disclose the consequences of defeating the Big Vein proposed amendment on the litigation at bar when communicating with the Big Vein limited partners, defense counsel engaged in misrepresentation and deceitful conduct. At no time did Altizer or any other representative of Consol inform Brittain or Moss of the pending motion to dismiss in the litigation between Big Vein and Consol. (Brittain Dep. 56, 60; Moss Dep. at 26.) In fact, Moss was completely unaware of the existence of the litigation between Big Vein and Consol at the time he entered into the Agreement with Consol, much less defense counsel's role in sustaining the grounds for the pending motion to dismiss. (Moss Dep. at 18.) As the Supreme Court of Virginia enunciated, "a person is required to speak ... when common honesty or fair dealing demand that he do so." *Cantrell v. Booher, Administratrix*, 201 Va. 649, 654 (1960), and that " `concealment,' designed to mislead another, is `conduct involving dishonesty, fraud, [or] deceit'," *Morrissey*, 248 Va. at 340. Here, defense counsel concealed the fact that Defendant had a pending motion to dismiss that raised the issue of Dale Harmon's authority to institute the lawsuit against Consol in order to exploit the limited partners concern over Dale Harmon's actions and age. The concealment of the motion to dismiss misled the limited partners into believing that objecting to the proposed amendment was in the best interest of Big Vein. Had Brittain and Moss known of the motion to dismiss, they would have never objected to the amendment. (Brittain Dep. at 27, 61; Moss Dep. at 30, 49.)

Moreover, defense counsel not only exploited the limited partners who opposed Dale Harmon's actions as Big Vein's managing partner, it attempted to persuade other limited partners who were neutral on the issue to object as well. The letters signed by Brittain and Moss that defense counsel mailed to all the Big Vein limited partners and the e-mail sent to W. & L. also concealed

the fact that Defendant had a pending motion to dismiss that ratification of Plaintiffs' proposed amendment would render moot. (Pls.' Ex. 4; McAllister Dep. Ex. 1.) Thus, defense counsel concealed its adversarial role in the underlying litigation in an effort to mislead the limited partners into unknowingly sabotaging Plaintiffs' defense to Defendant's Motion to Dismiss.

Defense counsel's misrepresentation of its adversarial role in the litigation is also evident by the terms of the Agreement. In the Agreement, defense counsel advised Brittain and Moss that they shared a "common legal interest" with Consol (Agreement at 3) and characterized any adverse interest between the Parties as merely "potential," while maintaining that "the particular nature of those adverse interests [could not] be identified at the time of entering into [the] Agreement." (Agreement at 4.) The Big Vein limited partners' interests, however, were much more than potentially adverse to Consol's interest. The Supreme Court of Virginia defined "having an adverse interest" as not only "a party to the litigation" but also "a person, though not a party, who [has] a financial or other personal interest in the outcome." *Daniels v. Morris*, 199 Va. 205, 211 (1957); *Weller v. Commonwealth*, 16 Va. App. 886, 892 (1993). Because the limited partners have a direct financial stake in the litigation and stand to lose undetermined amounts of money if the case is dismissed, the limited partners' interests are adverse to those of Consol. Defense counsel was fully apprised of the nature of the adversity between the interests of the Big Vein limited partners and Consol; however, counsel refused to identify that adversity when executing the Agreement with the Big Vein limited partners. The Agreement was "effective as of June 23, 2006," well after Defendant filed its Motion to Dismiss. (Agreement at 7.)

Further, by executing the Agreement under the guise that the Big Vein limited partners and Consol shared "common legal interests," defense counsel deceitfully ensnared Brittain and Moss to not only attempt to convince other Big Vein limited partners to object to the proposed amendment and potentially cause the dismissal of Big Vein's pending litigation, but also to freely "exchange … communications, documents, and other information" with the opposing party (Agreement at 3), resulting in the potential for Defendant to gain an unfair advantage at trial. *See* discussion *infra* Part II.C. Thus, defense counsel's deceitful conduct misled the Big Vein limited partners into believing that their "legal interests" were aligned with those of Consol, influencing the limited partners to enter into an Agreement that gave Defendant an upper hand in the litigation at the limited partners' expense. Because " `underhand practice' designed to `ensnare' an opponent" is conduct that "reflects adversely on the lawyer's fitness to practice law," defense counsel violated Rule 8.4(c) when it concealed the fact that Defendant had a pending motion to

98

dismiss in order to ensnare the Big Vein limited partners into inadvertently obstructing Plaintiffs' defense. *Gunter v. Virginia State Bar*, 238 Va. 617, 622 (1989); Va. Leg. Ethics Op. 1324 (1990).

3. *Virginia Rules of Professional Conduct 4.4: Respect for Rights of Third Persons*

Plaintiffs do not specifically allege that Defendants violated Rule 4.4 of the Virginia Professional Rules of Conduct; however, the Court finds this rule relevant to the case at bar. "In representing a client, a lawyer shall not use means that have no purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person." Va. R. Prof. Conduct 4.4. Comment 1 to the rule explains that:

> [1] Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons.

Va. R. Prof. Conduct 4.4, cmt. 1. The Committee further explains that it "adopted this Rule, for which there was no specific corresponding Disciplinary Rule, as a reminder that there is some limitation placed upon activities for which 'zealous representation' might be offered as an excuse." Va. R. Prof. Conduct 4.4 (Comm. Commentary). Here, defense counsel violated Rule 4.4 by attempting to ambush Plaintiffs' defense to the pending motion to dismiss and by executing the Agreement.

The letters signed by Brittain and Moss and edited and financed by defense counsel served to delay and burden Plaintiffs' defense to Defendant's Motion to Dismiss. Given the grounds of the pending motion to dismiss, the Court is unconvinced that defense counsel expended the time and expense of contacting each of the more than one hundred and fifty Big Vein limited partners (Pls' Bench Summ. at 2) for the sole purpose of having "the coal mined." (Def.'s Supp. Mem. at 15; Moss Dep. at 35.) While desiring to have the coal mined in Buchanan County is a worthy intention and the Court does not doubt defense counsel's sincerity in aspiring to achieve the goal of having the coal companies "coexist in a mutually beneficial relationship" (Moss Dep. at 35), there are ethical means of achieving that goal without resorting to "sharp practice." *See Corson v. Corson*, 160 Va. 552, 556 (1933). As the

United States Supreme Court reasoned, "[o]f course an attorney is required to advocate zealously the interests of the client, but there are limits to that advocacy." *In re Brose*, 77 L. Ed. 2d 1360 (1983).

Further, "Rule 4.4 prohibits an attorney from obtaining evidence in a manner that violates the rights of a third party." Va. Leg. Ethics Op. No. 1749 (2001). Because the limited partners are considered Big Vein's alter ego for the purpose of *ex parte* communication with defense counsel on matters relating to the proposed amendment, *see* discussion Part II.B.1.b, defense counsel is limited to formal means of discovery when obtaining information relevant to the underlying case from the Big Vein limited partners. *Pruett*, 69 Va. Cir. at 85. Further, because the Agreement seeks to obtain information relevant to the issues in this underlying case through means other than formal discovery, the Agreement violates Rule 4.4.

By its terms, the Agreement requires the exchange of:

> communications, documents, and other information between and among the Parties and their counsel as is reasonably necessary to achieve the ends and accomplish the purposes for which each Party has consulted or engaged counsel, and to permit the best representation and defense possible for each Party relating to this common set of facts and in which any of the Parties (or their current or former employees) is, are, or will be involved.

(Agreement at 3.) The Parties to the Agreement included Consol, Big Vein limited partners, Brittain and Moss, as well as defense counsel, Brian Jackson and Altizer (Agreement at 4, 15-16, 20), and the information sought to be exchanged is information relevant to the representation and defense for each Party; thus, this "information may only be properly obtained by a lawyer, acting on his client's behalf, in accordance with all required rules of procedure including those applicable to discovery." Va. Leg. Ethics Op. 1552 (1993). The Agreement executed by defense counsel, therefore, violates Big Vein's right to formal discovery and Rule 4.4.

## C. *Taint*

When exercising its discretion to disqualify counsel, a trial court must "determine independently whether the continued representation by counsel impedes the integrity of the proceedings." *United States v. Franklin*, 177 F. Supp. 2d 459, 464 (2001). A taint in the trial occurs where the integrity of a court's proceedings has been compromised so as to undermine "public

confidence in the legal system." *See Neuharth v. Quinn*, 23 Va. Cir. 252, 257 (1991). Further, a taint exists if a party "stands to somehow gain" from his attorney's unethical conduct and the ethical violation tends to "create a competitive imbalance in the adversarial process or call into question the fundamental fairness of the judicial system." *Gay*, 54 Va. Cir. at 470.

A trial is tainted not only where there is proof of actual prejudice to the opposing party, but also, "where the attorney's unprofessional conduct may affect the outcome of the case." *Dulles Corner Properties*, 38 Va. Cir. at 513. In *Franklin*, the court concluded that a trial was tainted by a "brief *ex parte* meeting" that not only "generated inconsistencies in the evidence that likely would not have been otherwise had [the party] been counseled by his attorney and had been protected from the 'wiles of opposing counsel'," but also implicated "[t]he integrity of the proceedings … by a potential consequence of the *ex parte* communications." 177 F. Supp. 2d at 468. Likewise, defense counsel tainted the underlying trial in the case at bar in two respects: (1) defense counsel's interference with Big Vein's amendment ratification process resulted in actual prejudice to the Plaintiffs' defense to the pending motion to dismiss and (2) the Agreement creates the potential for Defendant to gain an unfair advantage at trial.

First, the letter writing campaign designed to defeat the Big Vein proposed amendment interfered with the internal affairs of the Big Vein limited partnerships so as to unfairly delay Plaintiffs' defense to the pending motion to dismiss. This delay burdened the Plaintiffs with the additional time and expense of reformulating a defense to the motion to dismiss. Further, Defense counsel not only exploited Plaintiffs' limited partners' concern over an internal limited partnership affair in order to gain an advantage in litigation, it encouraged and instigated dissention among the limited partners through the execution of the Agreement. By providing the means for Defendant to "indemnify, hold harmless, and defend" Brittain and Moss:

> against any and all claims, suits, causes of actions, liabilities, losses, expenses (including attorney's fees, costs, and legal expenses related to any such defense), fines, penalties, taxes, demands, or damages of any nature whatsoever, whether at law or in equity or otherwise asserted by the Plaintiffs and/or C. Dale Harmon, Jr., arising out of or resulting from, and/or which are without limitation related in any way to, any actions and/or any acts or omissions which are themselves in any way related to and/or arising out of opposition to the Proposed Amendment, in challenging various actions and inactions of C.

> Dale Harmon, Jr., and this Common Interest Agreement. ....
> [and to] reimburse [Brittain and Moss] for expenses incurred
> in relation to actions taken in furtherance of the Common
> Interest Agreement

(Agreement at 8), defense counsel induced Brittain to influence other uncounselled limited partners of Big Vein to object to the proposed amendment and undermine Plaintiffs' defense to the pending motion to defense. Brittain did not address the age issue internally due to the apprehension that a confrontation with Dale Harmon would result in a lawsuit against Brittain. (Brittain Dep. at 43.) Further, Brittain was concerned that the effort to defeat the amendment "was going to get expensive and couldn't ask [Moss] to come in with [him] without having some way to protect [Moss]." (Brittain Dep. at 68-69.) Thus, the Agreement for indemnification and the payment of attorney's fees provided Brittain with incentive to pursue a campaign against the proposed amendment. (Brittain Dep. at 63.) Because Plaintiffs' counsel did not consent to defense counsel's *ex parte* communication with the limited partners, Plaintiffs' counsel did not advise the limited partners of the pending motion to dismiss prior to the communication. Defense counsel, however, unprofessionally disregarded Plaintiffs' attorney's request to refrain from "unauthorized communications" with any member of Big Vein (Pls.' Ex. 3) and proceeded to interfere with the ratification process of Big Vein's proposed amendment; thus, defense counsel delayed and burdened Plaintiffs' defense to Defendant's Motion to Dismiss and tainted the underlying trial. *See Upjohn*, 449 U.S. at 393 (noting that an organization's agent, although not part of the "control group," can "play a substantial role in deciding and directing a corporation's legal response").

Second, defense counsel's failure to disclose Consol's incentive to defeat the proposed amendment, while contracting for the free exchange of information between Consol and Plaintiffs' limited partners, created the potential for Defendant to gain an unfair advantage at trial. Defendant asserts that "Plaintiffs have failed to specify even one iota of information allegedly obtained by defense counsel from Plaintiffs' limited partners, much less explained how obtaining such information would assist defense counsel in this litigation." (Def. Mem. at 12.) The record, however, reflects the fact that defense counsel obtained the Big Vein limited partners' names and addresses as a result of the *ex parte* communication with Brittain and that the Big Vein limited partners' names and addresses assisted defense counsel in its attempt to frustrate Plaintiffs' defense to the pending motion to dismiss. (Brittain Dep. at 8, 32.) Although the list may have been otherwise discoverable under Va.

Sup. Ct. R. 4:1, because *ex parte* contact with the limited partners was improper, Rule 4.2 obligated defense counsel to use formal means of discovery in order to obtain the list. *See* Va. Leg. Ethics Op. 1749.

Discovery rules are designed to level the playing field in court and to prevent overreaching. *Fender v. Norfolk S. Ry.*, 55 Va. Cir. 344, 345 (2001) (finding that "[t]he concept of the discovery rules included in the Rules of Virginia Supreme Court is to encourage the reduction or elimination of surprises during the trial of the case and ... the fairness of the judicial process"). Further, "[b]cause the very essence of the legal system is to provide procedures by which matters can be presented in an impartial manner so that they may be decided solely upon the merits, any statement or suggestion by a lawyer that he can or would attempt to circumvent those procedures is detrimental to the legal system and tends to undermine public confidence in it." Va. Leg. Ethics Op. 1360. By its terms, the Agreement seeks to circumvent formal discovery. *See* discussion *supra* Part II.B.3; Agreement at 3. The Agreement, therefore, gives defense counsel an unfair advantage at trial by the possibility, if not the probability, that one of the Big Vein limited partners would volunteer vital information to defense counsel without Plaintiffs' attorneys' knowledge.

Defendant argues that the Agreement does not afford the Defendant an advantage at trial because the limited partners are not privy to "pivotal inside information" and "sensitive information" will not be exchanged. (Def.'s Supp. Mem. at 19.) A trial is tainted, however, where it can be shown that opposing counsel either (1) obtained privileged information or (2) gained an "unfair advantage." *Jeanblanc v. Oliver Carr Co.*, 23 Va. Cir. 44, 44-45 (1990). In this case, Defendant gained an unfair advantage.

Because the Agreement requires the exchange of information between "all officers, directors, employees, representatives, consultants, experts, attorneys, or agents of [Consol, Brittain, and Moss] as well as their heirs, representatives, and agents" (Agreement at 4) that is beneficial to the "common interest group" (Moss Dep. at 34), it is probable that, even if Brittain had not already given defense counsel the names and addresses of the limited partners, that either Brittain or Moss would hand over information, unbeknownst to Plaintiffs' counsel, to defense counsel that would give defense counsel an unfair advantage at trial. Further, the language of the Agreement reflects the potential detrimental effect of the secret exchange of information: "[t]he Parties agree that ... unauthorized disclosure of Common Interest Information, would result in irreparable harm and injury to the other Parties." (Agreement at 10.) It stands to reason that, if unauthorized disclosure of "common interest information" would result in "irreparable harm and

injury" to Defendant, Plaintiffs would suffer the same "irreparable harm and injury" as a result of unauthorized disclosure of the same information.

Further, Defendant mistakenly relies on the common interest privilege to argue that the Agreement is "permissible." (Def.'s Supp. Mem. at 14.) The Virginia Court of Appeals defined the common interest privilege as "extend[ing] to communications among co-defendants and their attorneys when engaged in consultation about their defense." *Hicks v. Commonwealth*, 17 Va. App. 535, 537 (1994). In *Hicks*, the Court reasoned that there is a "need for such a privilege among persons charged with the same crime … to consult together about their defense." *Id.* at 538. Absent a common defense, the privilege does not exist. Thus, the privilege is inapplicable in this context, where the Parties to the Agreement are adversaries in the underlying proceeding. Moreover, because the Agreement violates the Virginia Rules of Professional Conduct, the Agreement violates public policy and is void. *Cf. Shuttleworth, Ruloff and Giordano, P.C. v. Nutter*, 254 Va. 494 (1997).

Defense counsel undoubtedly anticipated that the Agreement would raise ethical concerns by including a "Waiver of Rights to Seek Counsel Disqualification" clause in the Agreement. The Parties agreed that "[a]s a condition precedent to receiving any Common Interest Information or protection provided under this Agreement … [e]ach Party knowingly and intelligently waives any right to seek disqualification in the Litigation, in any future litigation with the Plaintiffs, and in connection with opposition to the Proposed Amendment." (Agreement at 7.) Because Virginia's ethical rules "and standards [are] necessary to maintain public confidence in the legal profession," *Morrissey v. Virginia State Bar, ex rel. Third Dist. Committee*, 260 Va. 472, 480 (2000), an attorney must not veer too close to the ethical boundaries in the name of zealous representation. Thus, an attorney should exercise "sensitive professional and moral judgment," Va. R. Prof. Conduct, pmbl., when faced with an ethical dilemma and a "lawyer should be pushed back from coming too close to an ethical incursion." *Gay*, 54 Va. Cir. at 473. Because defense counsel anticipated ethical concerns arising out of the Agreement and attempted to eliminate repercussions that would result from its unethical conduct, defense counsel failed to exercise professional judgment and stretched the ethical boundaries to the point of rupture.

## III. *Conclusion*

Because the Big Vein limited partners controlled the ratification of the amendment proposed by the general partners on the advice of counsel, defense counsel exploited opportunities to communicate with the limited partners *ex*

*parte* and engaged in misrepresentation and deceitful conduct designed to defeat the proposed amendment, thereby delaying and burdening Plaintiffs' defense to Defendant's Motion to Dismiss in violation of Virginia Rules of Professional Conduct Rule 4.2, 4.4, and 8.4(c). As a result of defense counsel's unethical conduct, Plaintiffs were prejudiced by the additional time and expense of advising the limited partners in order to properly defend against the pending motion to dismiss. Thus, under the unique facts of this case, the Court considers the limited partners Big Vein's alter ego for the purpose of the amendment ratification process. As Plaintiffs' alter ego, defense counsel may communicate with the limited partners on the subject of the Big Vein amendment ratification only through established means of formal discovery.

Further, because the Agreement for the free exchange of information between Plaintiffs' limited partners and Defendant violates Virginia's discovery rules, it creates an unfair advantage for Defendant that taints the underlying trial and warrants the disqualification of the attorneys that are a party to the Agreement. Under this Court's "inherent right to supervise the conduct of attorneys practicing before [it] and to discipline an attorney who engages in misconduct, which includes the right to remove an attorney of record in a case," *Judicial Inquiry & Review Comm'n of Va. v. Peatross*, 269 Va. 428, 447 (2005), the Court is compelled to disqualify defense counsel, McGuireWoods and Altizer, Walk and White, in order to maintain the integrity of the proceeding. Sharp practice will not be tolerated by this Court.

Resolving all doubts in favor of disqualification, the Court finds that Plaintiffs met their burden and have shown that defense counsel's unethical conduct tainted the underlying trial and therefore grants Plaintiffs' Motion to Disqualify Defense Counsel as to the law firms of McGuireWoods and Altizer, Walk and White. The Court further enjoins McGuireWoods and Altizer, Walk and White from communicating with other Consol defense counsel as to the substance or content of any *ex parte* communications between defense counsel and the Big Vein limited partners that relates to the subject matter of this litigation during the transfer of representation or thereafter. Finding an award of attorney's fees inappropriate, the Court denies both Plaintiffs' and Defendant's Motions for Attorney's Fees and Costs. Further, the Court finds that Plaintiffs' filed this motion to disqualify in good faith and denies Defendant's Motion for Sanctions.